# 25-722

## In the United States Court of Appeals for the Second Circuit

CHANEL, INC.,
PLAINTIFF-APPELLEE

*v.*

WHAT COMES AROUND GOES AROUND LLC, DBA WHAT GOES AROUND COMES AROUND, MHW PROPERTIES, INC., PINES VINTAGE, INC., VINTAGE DESIGNS LTD., WGACA, LLC, WGACA WEB, LLC, WCAGA LA, LLC,
DEFENDANTS-APPELLANTS,

SETH WEISSER, GERARD MAIONE, WGACA WEB, LLC,
DEFENDANTS.

*On Appeal from the United States District Court for the Southern District of New York, No. 1:18-cv-2253 (The Hon. Louis L. Stanton)*

**BRIEF OF APPELLANTS AND SPECIAL APPENDIX**

PETER T. SHAPIRO
LEWIS BRISBOIS BISGAARD & SMITH LLP
*7 World Trade Center*
*250 Greenwich Street, 11th Fl.*
*New York, New York 10007*
*(212) 232-1300*

LISA S. BLATT
AMY MASON SAHARIA
ALEXANDER HELDMAN
DANA GOTFRYD
CLAIRE GRODEN
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, SW*
*Washington, DC 20024*
*(202) 434-5000*
*asaharia@wc.com*

## CORPORATE DISCLOSURE STATEMENT

Defendants-Appellants are multiple entities. What Comes Around Goes Around LLC is a New York limited liability corporation. MHW Properties, Inc. is a Florida corporation. Pines Vintage, Inc. is a Florida corporation. Vintage Designs, Ltd. is a New York corporation. WGACA, LLC is a Delaware corporation. WGACA Web, LLC is a Florida corporation. WCAGA LA, LLC, is a New York limited liability corporation.

Defendants-Appellants have no parent companies, no publicly held corporation owns more than 10% of their stock, and no publicly held company has a 10% or greater ownership interest in them.

WCAGA Web, LLC, was terminated as a Defendant on April 19, 2018, after the filing of the Amended Complaint. J.A.105. Seth Weisser and Gerard Maione were terminated as Defendants on October 29, 2018, following the filing of the Second Amended Complaint. J.A.153.

# TABLE OF CONTENTS

Page


STATEMENT OF JURISDICTION ........ 1
STATEMENT OF THE ISSUES ........ 1
STATEMENT OF THE CASE ........ 1
A. Statutory Background ........ 5
B. Factual Background ........ 7
C. Procedural History ........ 14
SUMMARY OF ARGUMENT ........ 19
STANDARD OF REVIEW ........ 22
ARGUMENT ........ 23
I. THE COURT ERRED BY NOT INSTRUCTING THE JURY ON THE STATUTORY DEFINITION OF A "COUNTERFEIT MARK". ........ 23
A. The Counterfeiting Instruction Erroneously Failed To Explain that Goods Made with the Mark Holder's Authorization Cannot Be Counterfeits. ........ 24
B. WGACA Was Entitled to the Proposed Instruction. ........ 32
C. The Error Gravely Prejudiced WGACA. ........ 38
II. THE COURT'S EXCLUSION OF EVIDENCE OF CHANEL'S WITNESSES' BIAS REQUIRES A NEW TRIAL. ........ 41
A. The District Court Abused Its Discretion in Excluding Evidence Showing the Bias of Chanel Witnesses. ........ 43
B. The Exclusion Prejudiced WGACA. ........ 49
III. THE STATUTORY DAMAGES AWARD VIOLATES THE DUE PROCESS CLAUSE ........ 51
A. The Award Violates the *Williams* Standard. ........ 52
B. The Award Violates the *Gore* Standard. ........ 56
IV. THE DISTRICT COURT ERRED IN AWARDING UNRECOVERABLE "COSTS" ........ 59
A. Chanel Requested "Costs" Only as Part of an Award of Attorneys' Fees. ........ 60
B. The Court Erred in Awarding Chanel Fees in the Guise of "Costs." ........ 63
CONCLUSION ........ 68

# TABLE OF AUTHORITIES

Page

## CASES

*4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202 (2d Cir. 2019) ....................60
*AL Infinity, LLC v. Crown Cell, Inc.*,
2023 WL 5097979 (S.D.N.Y. Aug. 9, 2023).....................................................27
*Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*,
2023 WL 8232072 (10th Cir. Nov. 28, 2023) ..................................................64
*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 369 F.3d 91 (2d Cir. 2004) ...................................................................66
*Balance Point Divorce Funding, LLC v. Scrantom*,
305 F.R.D. 67 (S.D.N.Y. 2015).........................................................................66
*Beachbody, LLC v. Johannes*,
2011 WL 3565226 (C.D. Cal. Aug. 12, 2011) ..................................................57
*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ...................................*passim*
*Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376 (2d Cir. 2006) ......22, 24, 32
*Brainstorm Interactive, Inc. v. School Specialty, Inc.*,
2014 WL 6893881 (W.D. Wis. Dec. 5, 2014) .............................................25, 26
*Burberry Ltd. v. Euro Moda, Inc.*,
2009 WL 4432678 (S.D.N.Y. Dec. 4, 2009), *report and recommendation adopted*, No. 8-cv-5781 (S.D.N.Y. Jan. 5, 2010)..............54
*Burberry Ltd. v. Yarbrough*, 2021 WL 5356757 (N.D. Ill. Nov. 17, 2021).......64
*Carvel Corp. v. Diversified Mgmt. Grp.*,
930 F.2d 228 (2d Cir. 1991) ...........................................................33, 38, 39
*Chanel, Inc. v. Banks*, 2011 WL 121700 (D. Md. Jan. 13, 2011), *amended report and recommendation adopted*,
No. 9-cv-843 (D. Md. Feb. 4, 2011)..........................................................55, 56
*Chanel, Inc. v. French*, 2006 WL 3826780 (S.D. Fla. Dec. 27, 2006)..........56, 57
*Chanel, Inc. v. The RealReal, Inc.*,
1:18-cv-10626 (S.D.N.Y. filed Nov. 14, 2018) .................................................42
*Coach Servs., Inc. v. K Ya Int'l, Inc.*,
2010 WL 2771897 (S.D.N.Y. June 10, 2010), *report and recommendation adopted*,
2010 WL 2771907 (S.D.N.Y. July 12, 2010) ....................................................55
*Coach, Inc. v. Celco Customs Servs. Co.*,
2014 WL 12573411 (C.D. Cal. June 5, 2014) ..................................................52

Page

Cases—continued:

*Coach, Inc. v. Ocean Point Gifts*,
2010 WL 2521444 (D.N.J. June 14, 2010)......................................................55
*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424 (2001)........22
*Country Vintner of N.C., LLC v. E. & J. Gallo Winery, Inc.*,
718 F.3d 249 (4th Cir. 2013)........................................................................65
*Curry v. Revolution Lab'ys, LLC*, 124 F.4th 441 (7th Cir. 2024).....................59
*Dattner v. Conagra Foods, Inc.*, 458 F.3d 98 (2d Cir. 2006).............................23
*El Greco Leather Prods. Co., v. Shoe World Inc.*,
806 F.2d 392 (2d Cir. 1986)..........................................................................29
*Gidatex, S.r.L. v. Campaniello Imps., Ltd.*,
82 F. Supp. 2d 136 (S.D.N.Y. 2000)................................................................64
*Glob. Van Lines, Inc. v. Glob. Moving Express, Inc.*,
2007 WL 7769395 (S.D.N.Y. Aug. 20, 2007)....................................................57
*Gortat v. Capala Bros., Inc.*, 795 F.3d 292 (2d Cir. 2015)................................63
*Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*,
38 F.3d 1429 (7th Cir. 1994)..........................................................................66
*Harris v. O'Hare*,
770 F.3d 224 (2d Cir. 2014), *as amended* (Nov. 24, 2014)........................30, 33
*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914 (9th Cir. 2015).......65
*Island Fund Management, Inc. v. RWS, Inc.*,
2019 WL 1466707 (S.D. Fla. Feb. 11, 2019),
*report and recommendation adopted*,
2019 WL 1468540 (S.D. Fla. Mar. 12, 2019)....................................................26
*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
327 F. Supp. 3d 606 (S.D.N.Y. 2018)...............................................................52
*Jones v. Unisys Corp.*, 54 F.3d 624 (10th Cir. 1995)..........................................64
*Knature Co. v. Duc Heung Grp., Inc.*,
2021 WL 3913194 (C.D. Cal. July 2, 2021).....................................................26
*LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*,
173 F.3d 454 (2d Cir. 1999)......................................................................22, 38
*Lobato v. Gomez*, 2017 WL 931824 (E.D. Cal. Mar. 8, 2017)............................48
*Louis Vuitton Malletier v. Artex Creative Int'l Corp.*,
687 F. Supp. 2d 347 (S.D.N.Y. 2010)..............................................................55

Page

Cases—continued:

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
2010 WL 5598337 (N.D. Cal. Mar. 19, 2010),
*aff'd in part, award vacated*, 658 F.3d 936 (9th Cir. 2011) ..........................52
*Manbro Energy Corp. v. Chatterjee Advisors, LLC*,
2023 WL 2563054 (S.D.N.Y. Mar. 17, 2023)..................................................48
*Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*,
112 F.3d 1296 (5th Cir. 1997)........................................................................26
*Murray v. Cingular Wireless II, LLC*, 242 F.R.D. 415 (N.D. Ill. 2005).........57
*Nike, Inc. v. Top Brand Co.*,
2006 WL 2946472 (S.D.N.Y. Feb. 27, 2006),
*report and recommendation adopted*,
2006 WL 2884437 (S.D.N.Y. Oct. 6, 2006)...............................................54, 55
*Palin v. New York Times Co.*, 113 F.4th 245 (2d Cir. 2024).......................44, 48
*Parker v. Time Warner Ent. Co.*, 331 F.3d 13 (2d Cir. 2003)..........................57
*Perry v. Ethan Allen, Inc.*, 115 F.3d 143 (2d Cir. 1997)........................22, 43, 51
*Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*,
2010 WL 2133937 (E.D.N.Y. Mar. 11, 2010),
*report and recommendation adopted*,
2010 WL 2160058 (E.D.N.Y. May 27, 2010)..................................................57
*Pitasi v. Stratton Corp.*, 968 F.2d 1558 (2d Cir. 1992) ......................................39
*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
674 F.3d 158 (3d Cir. 2012) ..........................................................................65
*Rasanen v. Doe*, 723 F.3d 325 (2d Cir. 2013).....................................................22
*Realtime Data, LLC v. CME Grp. Inc.*,
2014 WL 11820242 (S.D.N.Y. June 24, 2014),
*aff'd*, 600 F. App'x 771 (Fed. Cir. 2015).......................................................65
*Reichman v. Bonsignore, Brignati & Mazzotta P.C.*,
818 F.2d 278 (2d Cir. 1987) ..........................................................................67
*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017) .........................................32
*Rimini Street, Inc. v. Oracle USA, Inc.*, 586 U.S. 334 (2019) ....................60, 63
*San Diego Comic Convention v. Dan Farr Prods.*,
807 F. App'x 674 (9th Cir. 2020)....................................................................64
*Sara Lee Corp. v. Bags of New York, Inc.*,
36 F. Supp. 2d 161 (S.D.N.Y. 1999)........................................................55, 57
*Sony BMG Music Enter. v. Tenenbaum*, 719 F.3d 67 (1st Cir. 2013) ...........23

Page

Cases—continued:

*St. Louis, Iron Mountain & S. Ry. Co. v. Williams*,
251 U.S. 63 (1919)....................21, 51, 52
*Stampf v. Long Island R.R. Co.*, 761 F.3d 192 (2d Cir. 2014) ....................57
*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ....................58
*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) ....................63, 65
*Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74 (2d Cir. 2020)....................24
*Top Tobacco, L.P. v. Star Imps. & Wholesalers, Inc.*,
2024 WL 1190758 (N.D. Ga. Feb. 20, 2024),
*aff'd*, 135 F.4th 1344 (11th Cir. 2025)....................52
*Tri-Star Pictures, Inc. v. Unger*, 42 F. Supp. 2d 296 (S.D.N.Y. 1999)....................64
*U.S. ex rel. Barko v. Halliburton Co.*, 954 F.3d 307 (D.C. Cir. 2020)....................65
*U.S. ex rel. Becker v. Tools & Metals, Inc.*,
2013 WL 1293818 (N.D. Tex. Mar. 31, 2013) ....................67
*U.S. ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153 (2d Cir. 1996)....................64, 66
*U.S. ex rel. MC2 Sabtech Holdings, Inc. v. GET Eng'g Corp.*,
2025 WL 391389 (S.D. Cal. Feb. 4, 2025) ....................48
*United States v. Abel*, 469 U.S. 45 (1984)....................43
*United States v. Cone*, 714 F.3d 197 (4th Cir. 2013) ....................27
*United States v. Haggett*, 438 F.2d 396 (2d Cir. 1971) ....................43
*United States v. Harvey*, 547 F.2d 720 (2d Cir. 1976) ....................44, 51
*United States v. Ramirez*, 609 F.3d 495 (2d Cir. 2010)....................22
*United States v. Thompson*, 359 F.3d 470 (7th Cir. 2004) ....................43
*Walpert v. Jaffrey*, 2016 WL 11271873 (S.D.N.Y. Aug. 17, 2016),
*report and recommendation adopted*,
2017 WL 1063461 (S.D.N.Y. Mar. 21, 2017)....................67
*Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238 (2d Cir. 2009) ....................5

**STATUTES AND RULES**

Lanham Act, 15 U.S.C. § 1111 *et seq.* ....................5

Page

Statutes and Rules—continued:

15 U.S.C.
§ 1114 ... 5, 6, 15, 31
§ 1116 ... *passim*
§ 1117 ... *passim*
§ 1121 ... 1
§ 1125 ... 5, 15
§ 1127 ... 5, 6, 24
18 U.S.C. § 2320 ... 27
28 U.S.C.
§ 1291 ... 1
§ 1331 ... 1
§ 1338 ... 1
§ 1821 ... 60, 63, 64
§ 1920 ... 60, 63, 64, 65, 66
Fed. R. Civ. P.
50 ... 1
54 ... 61
59 ... 1
Fed. R. Evid.
402 ... 43
403 ... 43
S.D.N.Y. Local Civ. R. 54.1 ... 61, 64, 65

**OTHER AUTHORITIES**

Am. Ans., *Chanel, Inc. v. The RealReal, Inc.*, No. 1:18-cv-10626 (S.D.N.Y. Feb. 25, 2021), Dkt. 120 ... 42
Jury Charge, *Farouk Systems, Inc. v. Costco Wholesale Corp.*, No. 4:09-cv-03499 (S.D. Tex. Oct. 12, 2011), Dkt. 81 ... 27
Jury Instructions, *Atari Interactive, Inc. v. Redbubble, Inc.*, No. 4:18-cv-03451 (N.D. Cal. Nov. 4, 2021), Dkt. 252 ... 28
Jury Instructions, *Romag Fasteners, Inc. v. Fossil, Inc.*, No. 3:10-cv-1827 (D. Conn. Apr. 2, 2014), Dkt. 410 ... 28
3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (5th ed. 2025) ... 6, 64
S. Rep. No. 104–177 (Nov. 28, 1995) ... 56
*Spurious*, Black's Law Dictionary (11th ed. 2019) ... 24

## STATEMENT OF JURISDICTION

The district court (Stanton, J.) had jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a) and 1338(b). The court entered a final judgment on February 26, 2025, SP.A.4-11, and WGACA timely filed a notice of appeal on March 27, 2025, J.A.3229. The court entered an order resolving WGACA's post-judgment motions under Rules 50 and 59 on June 26, 2025, SP.A.12-28, and WGACA filed a timely amended notice of appeal on July 7, 2025, J.A.3399. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in failing to instruct the jury that authorized uses of registered marks cannot be counterfeits.

2. Whether the district court abused its discretion in excluding evidence of the bias of Chanel's witnesses.

3. Whether the $4 million statutory damages award—which amounts to $285,714 for each of the fourteen allegedly counterfeit bags that WGACA sold—is so excessive as to violate the Due Process Clause.

4. Whether the district court erred in awarding unrecoverable costs.

## STATEMENT OF THE CASE

Over the past few decades, the launch and growth of the luxury resale market has democratized access to luxury goods. Previously accessible only

to the wealthy, luxury goods are now available to millions of customers at approachable prices. The luxury resale market gives new life to countless preloved products, while promoting sustainability.

Founded in 1993, defendant-appellant What Goes Around Comes Around (WGACA) is one of the country's first vintage luxury resellers, selling pre-owned products from brands like Prada, Gucci, Hermès, and Chanel. WGACA's key insight was to offer customers access to pre-owned luxury goods they could *trust*, unlike supposedly "genuine" goods found on the street. WGACA built a team dedicated to traveling the world, locating trusted sources, and evaluating each product to guarantee authenticity. The idea worked: for over thirty years, customers have walked into WGACA's stores and fallen in love with pre-owned luxury pieces.

Plaintiff-appellee Chanel manufactures luxury goods, including handbags. Threatened by the growth of the luxury resale market, Chanel sued WGACA for trademark infringement, counterfeiting, and related claims. At trial, a jury concluded that WGACA willfully infringed Chanel's trademarks, created false association with Chanel, engaged in false advertising, and sold fourteen handbags bearing two allegedly counterfeit marks. Thirteen of the allegedly counterfeit bags bore serial numbers that Chanel had created and

issued to a factory in Italy but that Chanel claimed had been stolen from the factory. Chanel never disclosed the theft or the at-issue serial numbers to the public.

For the fourteen allegedly counterfeit bags, the jury gave Chanel a staggering $4,000,000 in statutory damages ($2 million for each mark). Following a bench trial on equitable remedies, the court added $12,739 in disgorged profits and $560,978.97 in so-called "costs." The court also enjoined WGACA from asserting various associations with Chanel.

Although WGACA vigorously disagrees with the jury's verdicts as to infringement, false association, and false advertising, it is not challenging on appeal those verdicts or the resulting disgorgement and injunction. WGACA challenges on appeal only the counterfeiting verdict and resulting award of statutory damages and the "costs" award.

The jury trial was fundamentally flawed, swayed by errors that prejudiced WGACA and left the jury confused as to the applicable law. Even before trial began, the district court stymied WGACA's defense by excluding evidence that Chanel developed a strategy of using lawsuits to tackle the business threat of the resale market, biasing its witnesses against WGACA. That

evidence was critical for the jury to evaluate the credibility of Chanel's witnesses, who unfairly painted WGACA as nefarious.

The court further prejudiced WGACA by declining to instruct the jury that an authorized use of a registered mark cannot be a counterfeit mark. For weeks, the jury heard evidence indicating that the fourteen allegedly counterfeit bags were, in fact, likely produced under authorization by a Chanel-contracted factory. The jury was never instructed, consistent with the Lanham Act, that handbags made by an authorized Chanel factory are not counterfeit. Without that instruction, the jury remained free to come to the incorrect conclusion that genuine bags could be counterfeits. That error also infected the jury's assessment of WGACA's willfulness as to the allegedly counterfeit nature of those handbags, thirteen of which bore genuine Chanel serial numbers that WGACA had no way of knowing were allegedly stolen and voided in Chanel's internal database.

These errors produced a $4 million statutory damages award so extreme that it offended due process, wholly disconnected from any relationship to WGACA's conduct or culpability or any damage to Chanel. That egregious sum was made all the worse by the court's $560,978.97 award of what it deemed "costs" but were instead unrecoverable attorneys' fees.

This Court should vacate the counterfeiting verdict and remand for a new trial. At a minimum, the Court should vacate the statutory damages award and the award of "costs."

### A. Statutory Background

This case arises under the trademark infringement and counterfeiting provisions of the Lanham Act, 15 U.S.C. § 1111 *et seq*. The Act defines a trademark as "any word, name, symbol, … or any combination thereof" that identifies goods and distinguishes them from the goods of others. *Id.* § 1127. It imposes liability on anyone who, without the mark holder's permission, "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" in a way that is likely to cause confusion. *Id.* § 1114(1)(a); *see also id.* § 1125(a) (same for unregistered marks). It also imposes liability on anyone who "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of [their] or another person's goods, services, or commercial activities." *Id.* § 1125(a)(1)(B).

Under the first-sale doctrine, after the mark holder sells a good, others may resell the good containing the mark without incurring infringement liability, even if the later "sale is not authorized by the mark owner." *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) (quotations

omitted). But a reseller infringes the mark when it sells mark-bearing goods that the mark holder did not *previously* authorize for sale (for example, stolen goods). 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:41 (5th ed. 2025) (McCarthy).

If a mark holder proves infringement and/or false advertising, the Act permits recovery of damages, the defendant's profits, costs, and injunctive relief. 15 U.S.C. §§ 1116, 1117(a). In "exceptional cases," the court "may award reasonable attorney fees to the prevailing party." *Id.* § 1117(a).

The Act provides additional remedies where the defendant *counterfeits* a registered mark. A "counterfeit" is a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." *Id.* § 1127. A "counterfeit mark," as it relates to claims under section 1114(1)(a), is a counterfeit of a registered mark. *Id.* § 1116(d)(1)(A)-(B)(i). But the definition of a counterfeit mark does not include

> any mark or designation used on or in connection with goods or services of which the manufacture[r] or producer was, at the time of the manufacture or production in question[,] authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.

*Id.* § 1116(d)(1)(B).

If a mark holder proves counterfeiting, it may elect to recover statutory damages of between $1,000 and $200,000 per counterfeit mark per type of goods sold. *Id.* § 1117(c)(1). If the court finds that the defendant *willfully* used counterfeit marks, the maximum statutory damages award becomes $2,000,000 per counterfeit mark per type of good. *Id.* § 1117(c)(2).

**B. Factual Background**

1. In 1993, Seth Weisser and Gerard Maione founded WGACA in New York City. J.A.4101. At the time, they realized that the secondhand market lacked stores that curated collections of authentic, pre-owned luxury goods—instead, consumers interested in vintage luxury had to trek to stores like Goodwill and hope to get lucky. J.A.4101.

WGACA's first location, a small store in SoHo, changed that. J.A.4101. For the first time, customers could enjoy the experience of a modern boutique centered on vintage luxury. J.A.4101. From that first shop, WGACA expanded to multiple stores, J.A.4122, and eventually entered almost two dozen partnerships with companies like Belk and Dillard's to make authentic luxury goods available to wider audiences, J.A.7214, 4040.

Central to WGACA's success is its commitment that its customers can trust the products they're purchasing. J.A.4108-09. WGACA pledged to offer

only verifiably authentic goods. J.A.5624. WGACA's authenticators, trained in the history of the designer products they're tasked with authenticating, bring that guarantee to life. J.A.4107-08.

WGACA employs a multi-step authentication process. First, WGACA looks to buy most of its goods "from dealers in the space" who, like WGACA, "have a genuine and dedicated resolve" to sell genuine products and who implement their own authenticity processes. J.A.3922. When WGACA decides to purchase a product, it inspects and verifies each item. J.A.4934. Then, when each product arrives at WGACA's warehouse, it is again inspected in detail by WGACA's trained authenticators, who log the pertinent, genuine characteristics in WGACA's internal system. J.A.4934. If a product passes its final check, it receives a letter of authenticity; only then is it allowed in WGACA's stores or website. J.A.5624.

For each brand it sells, WGACA compiles a compendium of that brand's idiosyncrasies over time. J.A.4108. For example, WGACA teaches its authenticators Chanel's historical serial numbers, styles of chain straps, and the companies from which Chanel commonly purchases its metal snaps. J.A.4705. As brands develop new styles, WGACA tries its best to keep up. J.A.4108.

Although for decades WGACA has sold products from over fifty different luxury brands—including marquees like Hermès, Louis Vuitton, Prada, and Gucci, *see, e.g.*, J.A.4719-24—*not a single brand other than Chanel* has ever complained to WGACA about false advertising, trademark infringement, counterfeiting, or the like. J.A.4102. WGACA's success authenticating Chanel products is no different: of the more than *70,000* Chanel handbags—and over 100,000 total Chanel products—WGACA has sold from 2014 through 2023, J.A.4102, Chanel identified only *fourteen* handbags that were purportedly counterfeit. All but one of those handbags bore authentic Chanel serial numbers that Chanel had secretly voided. J.A.4102; *see infra* pp.32-33.

2. Chanel is a manufacturer of luxury goods. It is a global behemoth, with over $17 billion in revenue in 2023. J.A.3472. Chanel purports to maintain strict control over the manufacture and sale of its products. J.A.3779.

Chanel authorizes factories to use its trademarks and manufacture Chanel products. J.A.3739-40. One such factory is the Renato Corti factory in Italy. J.A.3504. When Chanel wants the Corti factory to produce a handbag, it orders the handbag's components (like leather and metal parts) and has those parts sent to the factory. J.A.3500. At the same time, Chanel creates a serial number and allots the number to Corti, meaning no other factory can

use that number. J.A.376, 3587. Chanel then sends physical serial number cards and stickers (for insertion into handbags) to the factory. J.A.3736. Corti receives the cards, produces the handbags per Chanel's specifications, and inserts the serial numbers. J.A.3736. The factory then hands off each bag to the on-site distribution center, which conducts a quality check, scans the serial number, and pairs the serial number with the specific handbag in Chanel's database. J.A.3736.

Outside of this process, Chanel believes it is "impossible" or very "difficult" to get genuine, original Chanel hardware. J.A.3603, 3540. Chanel is so confident in the security of its supply chain that it believes the mere presence of "original hardware" in a handbag means that handbag originated from a Chanel-authorized factory. J.A.3737.

Chanel logs its serial numbers in a database it calls ORLI. J.A.3505. Although Chanel relies almost entirely on ORLI to track and authenticate its products, ORLI is riddled with data issues. For example, Chanel did not import into ORLI any serial numbers pre-dating ORLI's genesis in 1993. J.A.3737. Further, hundreds of serial numbers in ORLI have been inexplicably "voided." J.A.3740-41, 3746. In the ordinary course, Chanel voids a number—meaning the serial number may no longer be used to make Chanel

products—if it identifies some issue with that number (like a disappearance or mistake). J.A.3587, 3737-38. It often takes Chanel years to identify such issues. *See, e.g.*, J.A.3586-87 (eighteen years), J.A.3740 (seventeen years). But for many voided numbers within ORLI, Chanel never determines, or logs, any cause at all. J.A.3741, 3746. A voided number does not mean that Chanel never made a bag with that number—just that Chanel has no record of one and so cannot say for certain either way. J.A.3798.

Notwithstanding these flaws, Chanel's own authenticators rely on ORLI to authenticate bags. J.A.3748. The first step Chanel's authenticators take is to check the bag's serial number in ORLI and see if the description matches the bag. J.A.3573, 3764. Chanel does not share the ORLI data with its own manufacturers, let alone with resellers like WGACA. J.A.3741, 3764. But the Corti factory was an exception to this rule: Corti employees could change ORLI data. J.A.3606-07.

3. In late 2012, Chanel experienced one of the worst thefts in its history. In just *twelve minutes*, someone at the Corti factory "force[d] open the door of the company warehouse, remove[d] the access door to the internal storage from its hinges, f[ound] the cart locked with a padlock that protected [the serial number cards] and, once the lock was broken," stole 30,000 cards,

"successfully fleeing before the patrol arrived." J.A.4308, 4183, 3507, 3543-44. According to a criminal complaint, given the sheer efficiency of the crime, it was "evidently" committed by people already "perfectly familiar with the premises of the Corti company" who acted "with precise intent to exclusively steal the authenticity cards." J.A.4308. It was also "evident" that the criminals "kn[e]w and appl[ied], at least partially, the production techniques of the *maison* [Chanel], perhaps using materials that are in compliance and the accessories typical of its production." J.A.4310.

After Chanel identified the 30,000 stolen serial numbers, it voided those numbers in ORLI. J.A.3507-08. Chanel never disclosed the Corti theft or told anyone—suppliers, customers, or resellers like WGACA—that serial numbers had been stolen. J.A.3791.

The stolen Corti numbers appear in thirteen of the fourteen bags sold by WGACA that Chanel claims are counterfeit. J.A.3988.[1]

[1] Chanel claimed the fourteenth bag, a brown pouch, is counterfeit for a different reason: the serial number WGACA associated with the bag in its database did not match the bag's description in ORLI. J.A.3981. A WGACA employee testified that the serial number was identified in error; the handbag itself had no identifiable serial number because the interior had been re-lined, as demonstrated by a repair certificate that came with the bag. J.A.3603, 3874-75.

4. As the luxury resale market grew, so too did Chanel's concern about the impacts of that market on its business. Chanel began what it called the Second Hand Project, an effort to study the market, what was "at stake for Chanel," and how it could be "tackle[d]." J.A.897, 903.

That project culminated in a meeting of Chanel senior executives in May 2017 to discuss how to tackle the threat. J.A.897. The proposed response was not subtle: Chanel suggested that what "can be achieved" against the "Second Hand" market was "[p]ossible legal action." J.A.922. At stake was a "[t]hreat to [Chanel's] business model" and the "[d]ilution of [its] authority." J.A.971. Approaches that would instead "partner" with players in the resale market had the "con[]" of "legitimating [that market and] creat[ing] value for it," without "full control" for Chanel. J.A.981; *see also* J.A.985.

Chanel ultimately decided not to participate in the secondary market at all. J.A.3463. Instead, Chanel made clear to its customers that it "does not endorse or support the purchase of preowned items." J.A.3567. And Chanel chose to initiate legal action to combat the business threat of the secondary market: by May 2017, Chanel had filed "3 lawsuits" and served "15 cease and desist letters against resale sites." J.A.922.

Chanel sent WGACA one cease-and-desist letter in 2015. J.A.4924. That letter identified a single, allegedly counterfeit handbag on WGACA's website. J.A.4924; *see also* J.A.4926. Upon receiving the letter, WGACA checked the identified bag and realized the serial number in the bag did not match the serial number on the website. J.A.3709-10. WGACA responded, explaining that the correct serial number demonstrated the bag was not counterfeit. J.A.4929-33. WGACA was unable to locate in its system a bag with the serial number that Chanel had flagged as counterfeit. J.A.3711. After Chanel thanked WGACA for "clearing this matter up," WGACA's CEO observed that the back and forth was "[v]ery funny" and "[s]o legal." J.A.6949-50.

WGACA did not hear from Chanel again for three years, until Chanel's strategy against WGACA proceeded to "legal action." J.A.922. Only after this suit was filed—six years after the Corti theft and three years after Chanel's cease-and-desist letter—did Chanel disclose to WGACA the theft and the allegedly stolen serial numbers.

### C. Procedural History

1. In March 2018, Chanel sued WGACA and its owners in the U.S. District Court for the Southern District of New York. J.A.1. In the operative second amended complaint, Chanel alleged that WGACA's advertising and

resale practices infringed Chanel's trademarks and improperly traded off Chanel's brand to create the false perception that WGACA is affiliated with Chanel. J.A.173-181. Chanel asserted claims for counterfeiting and trademark infringement under 15 U.S.C. § 1114(1); false advertising under 15 U.S.C. § 1125(a)(1)(B); unfair competition under 15 U.S.C. § 1125(a)(1)(A); and associated state-law claims. Chanel sought injunctive relief, statutory damages, disgorgement of profits, and attorneys' fees.

In 2022, the district court granted in part WGACA's cross-motion for summary judgment, dismissing the state-law claims. J.A.558. The court also granted in part Chanel's motion for summary judgment on several claims, but later it "vacated" one of its rulings and "suspended" the remainder "to be either vacated or affirmed by the outcome of the jury trial." J.A.1047, 3938-39. As relevant here, the court left for trial the questions whether (1) WGACA was liable for using Chanel's marks in advertising, J.A.573-86; (2) WGACA infringed Chanel's marks by selling genuine "point-of-sale" items (such as trays and mirrors) bearing the Chanel logo but not authorized for sale by Chanel, J.A.3938; (3) fifty-one bags sold by WGACA with serial numbers that Chanel had voided in its database were non-genuine and thus infringing, J.A.589-96;

and (4) the handbags bearing the Corti serial numbers and one additional bag were non-genuine or counterfeit, J.A.598, 600-04, 3938.

In resolving the motions, the court explained its view of the difference between infringing and counterfeiting under the Lanham Act: "A counterfeit is a copy which is so close that it is difficult to tell from an original. Thus, a shoe which is made in the manufacturer's factory, and meets its specifications, but is unauthorized for sale, is an infringement, but not a counterfeit." J.A.598 n.9.

2. During discovery, Chanel produced internal corporate documents revealing that, in 2017, it had identified the growth of luxury resellers like WGACA as a problem that could "become[] huge and a real threat." J.A.976; *see supra* p.13. Before trial, the court granted Chanel's motion to preclude WGACA from introducing evidence that Chanel perceived WGACA as a threat to its business model, J.A.731, reasoning that the evidence would "provide no help in deciding the trial disputes over claims that WGACA infringed Chanel's trademarks," SP.A.2.

Trial proceeded in two phases.[2] Phase I, a jury trial on liability, took place in early 2024. At the conclusion of trial, the court instructed the jury on the definition of a counterfeit. J.A.3988. Although the court had originally proposed instructing that bags "manufactured by a factory authorized by Chanel to make Chanel handbags" are not counterfeit—an instruction that reflected the statutory definition, 15 U.S.C. § 1116(d)(1)(B); *see infra* pp.24-32—it omitted that instruction at Chanel's request, over WGACA's objection. J.A.3954-55.

The jury found WGACA liable for trademark infringement, false association, unfair competition, false advertising, and counterfeiting. J.A.1168-71. And it found that WGACA acted willfully as to each claim. J.A.1168-71. As relevant here, the jury found that WGACA sold fourteen counterfeit Chanel bags (out of roughly 70,000 total Chanel bags sold by WGACA during the relevant period, *see* J.A.4102) and awarded Chanel the maximum of $4,000,000 in statutory damages for willful counterfeiting under 15 U.S.C. § 1117(c)—$2 million for each of the two at-issue Chanel marks. J.A.1170-71.

---

[2] The court initially denied WGACA's bifurcation request on the ground that "the Lanham Act is a law act, disgorgement is a law remedy, and counterfeit is a law concept." SP.A.2. The court later recognized its error and ordered bifurcation. J.A.1045.

3. The court then held a bench trial on equitable remedies. Under 15 U.S.C. § 1117(a), Chanel requested disgorgement of WGACA's profits from its sale of Chanel items from 2014 to 2024, purportedly totaling nearly $60 million, plus an additional $34.5 million in what Chanel called an "opportunity benefit." J.A.4011, 4014-15. The court rejected Chanel's request, instead ordering disgorgement of $12,739. J.A.3397. The court explained that injunctive relief was "the most appropriate and effective remedy" for Chanel's claims, "particularly given the lack of tangible economic harm to Chanel." SP.A.27. Its disgorgement award reflected net profits from the sale of approximately 51 handbags with voided serial numbers and 779 point-of-sale items—both of which the jury found to infringe. SP.A.27-28; *see* J.A.1169. The total monetary judgment was thus $4,012,739. SP.A.11.

The court also permanently enjoined WGACA from using in its advertising Chanel's stylized font, hashtags or discount codes that include the word "Chanel," props bearing the "Chanel" marks, or the likeness of Coco Chanel. SP.A.7-8. The court further required WGACA to disclaim any association with Chanel on its website and product tags, and enjoined WGACA from using Chanel marks in selling Chanel-branded merchandise more than "necessary to identify the particular item being offered for sale." SP.A.8. Finally, the court

ordered WGACA to disclose repairs or restorations made to Chanel-branded items. SP.A.9.

4. WGACA moved for judgment as a matter of law or, in the alternative, a new trial on willful counterfeiting and sought remittitur on the amount of statutory damages. J.A.3155-56. Chanel moved for $6,715,377 in attorneys' fees and $560,979 in related "disbursements." J.A.1770-71, 1776. The court denied WGACA's motion and granted in part and denied in part Chanel's, denying attorneys' fees but granting Chanel $560,978.97 in electronic discovery expenses and legal research fees, which the court called "costs." SP.A.12-28.

## SUMMARY OF ARGUMENT

The district court's errors prevented WGACA from mounting a full defense to the counterfeiting claim. They resulted in a jury blind to crucial context and ignorant of the legal principles that shaped WGACA's defense. Those shortcomings compounded to a $4 million statutory damages award so shocking that it offends due process. And to make matters worse, the district court awarded Chanel $560,978.97 in "costs" barred from recovery.

I. The court erred in not instructing the jury that, per the Lanham Act, if the allegedly counterfeit bags were manufactured by a factory authorized

by Chanel to use its marks, those bags could not bear counterfeit marks. The Act's definition of "counterfeit marks" does not include authorized uses of marks. From the beginning of this case, WGACA maintained that the bags Chanel challenged as counterfeit were manufactured in the Chanel-authorized Corti factory. Every exhibit WGACA introduced and every cross-examination it conducted on the counterfeiting claim advanced this theory. The district court's eleventh-hour decision to eliminate this part of the definition from the instructions neutered that defense. The court's error also made it impossible for the jury to answer the follow-on question of WGACA's intent. The error requires a new trial on the counterfeiting claim.

II. The district court also abused its discretion by excluding evidence of the bias of key Chanel witnesses. It is axiomatic that evidence of bias is a vital tool to impeach credibility. Yet—with minimal reasoning—the court jettisoned clear evidence that Chanel witnesses were biased against the very existence of the secondhand market that WGACA exemplifies. When those witnesses testified repeatedly that they had no qualms with the growth and vitality of that industry, WGACA was left powerless to prove otherwise. Because these witnesses were instrumental in branding WGACA as a bad actor,

WGACA's inability to prove their bias was deeply prejudicial and warrants a new trial.

III. The Due Process Clause places independent limits on monetary judgments. *See St. Louis, Iron Mountain & S. Ry. Co. v. Williams*, 251 U.S. 63, 64-67 (1919); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-85 (1996). The egregious $4 million statutory damages award breaches those limits. Even accepting the jury's flawed willfulness verdict, the punishment bears no rational relationship to WGACA's conduct or culpability. Chanel identified only fourteen allegedly counterfeit bags, and WGACA proved that one of those bags was materially indistinguishable from an authentic product. The $4 million award dwarfs other statutory damages awards on similar facts. Imposing maximum statutory damages under these circumstances was wholly disproportionate to the "offense" and transforms the Lanham Act from a tool of appropriate deterrence into an instrument of grossly excessive punishment.

IV. Finally, the "costs" award should be vacated. Chanel sought electronic discovery and legal research expenses only as a component of attorneys' fees. The district court appropriately concluded that Chanel is not entitled to a fee award because this is not an exceptional case under 15 U.S.C. § 1117(a). To the extent the district court thought it could award these expenses as "costs

of the action" under the Lanham Act (even though Chanel did not request such relief), it was mistaken. This Court has held that legal research fees are not recoverable costs. And electronic discovery expenses of the type that Chanel requested are likewise unrecoverable.

## STANDARD OF REVIEW

This Court reviews preserved challenges to jury instructions *de novo*. *Rasanen v. Doe*, 723 F.3d 325, 331 (2d Cir. 2013). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 390 (2d Cir. 2006) (cleaned up). Unless an erroneous instruction is "harmless," it "requires a new trial." *LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*, 173 F.3d 454, 460 (2d Cir. 1999) (quotations omitted).

This Court reviews evidentiary rulings for abuse of discretion. *United States v. Ramirez*, 609 F.3d 495, 499 (2d Cir. 2010). An erroneous evidentiary ruling warrants a new trial when "it is likely that in some material respect the factfinder's judgment was swayed by the error." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997) (cleaned up).

This Court reviews the due process challenge to the statutory damages award applying the same standards as the district court. *Cooper Indus., Inc.*

*v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 431-43 (2001) (applying *Gore*); *Sony BMG Music Enter. v. Tenenbaum*, 719 F.3d 67, 70-72 (1st Cir. 2013) (applying *Williams*).

The district court's authority to award costs is a question of law reviewed *de novo*. *Dattner v. Conagra Foods, Inc.*, 458 F.3d 98, 100 (2d Cir. 2006).

## ARGUMENT

### I. THE COURT ERRED BY NOT INSTRUCTING THE JURY ON THE STATUTORY DEFINITION OF A "COUNTERFEIT MARK."

The instructions on the definition of a "counterfeit mark" misstated the law and left the jury with the misimpression that even bags that Chanel authorized to bear its marks could be counterfeits. This error was anything but harmless: the jury lacked the tools it needed to evaluate WGACA's defense that Chanel had authorized the Corti factory to make thirteen of the fourteen allegedly counterfeit bags and that they were identical to authentic bags. And without a correct definition of a counterfeit mark, the jury could not answer the downstream question of whether WGACA acted willfully in selling any given "counterfeit." This error pervaded the jury's verdict. This Court should vacate the counterfeiting verdict and remand for a new trial.

### A. The Counterfeiting Instruction Erroneously Failed To Explain that Goods Made with the Mark Holder's Authorization Cannot Be Counterfeits.

The district court instructed the jury that "[a] counterfeit trademark means a mark that is not genuine or authentic but is substantially indistinguishable from a registered trademark." J.A.3988. A "counterfeit handbag," the court went on, "is so close a copy that it is difficult to tell it from the original." J.A.3988. This instruction included only half of the statutory definition and thus "d[id] not adequately inform the jury on the law." *Boyce*, 464 F.3d at 390 (quotations omitted).

1. The Lanham Act defines a "'counterfeit' [a]s a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.[3] In "[c]ivil actions arising out of [the] use of counterfeit marks," the term "counterfeit mark" means a "counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use[.]" *Id.* § 1116(d)(1)(B)(i).

---

[3] Though the Lanham Act does not provide its own definition, the Second Circuit has defined "spurious" as a mark "that is 'fake' and '[d]eceptively suggest[s] an erroneous origin.'" *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 95 n.18 (2d Cir. 2020) (quoting *Spurious*, Black's Law Dictionary (11th ed. 2019)).

But the statutory definition does not stop there. Instead, the definition continues that "counterfeit mark[s]"

> do[] not include any mark or designation used on or in connection with goods or services of which the manufacture[r] or producer was, at the time of the manufacture or production in question[,] authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.

*Id.* § 1116(d)(1)(B). The Lanham Act then imports this definition into the provision authorizing statutory damages that Chanel invoked here. *See id.* § 1117(c) ("In a case involving the use of a counterfeit mark (as defined in section 1116(d) of this title) ….").

The definition is clear: if the goods at issue were made by someone who, at the time of manufacture, had permission to use the mark on that *type* of goods, those goods are not counterfeits. The language is without limitation. No matter how the goods entered the stream of commerce—imported from other countries without permission (parallel imports), produced in excess of numbers authorized (overruns), sold through unofficial channels (gray goods), or through any other route—they are not counterfeit.

2. Courts have confirmed this straightforward textual interpretation time and again. For example, in *Brainstorm Interactive, Inc. v. School Specialty, Inc.*, the court rejected a counterfeiting claim because the "Lanham Act

counterfeit trademark claim *does not cover*" situations where the defendant "was an authorized licensee of that mark" "[a]t the time defendant manufactured or produced the alleged" counterfeiting products. 2014 WL 6893881, at *16 (W.D. Wis. Dec. 5, 2014) (citing 15 U.S.C. § 1116(d)(1)(B)). Similarly, in *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, the court concluded that goods manufactured by "the owner of the right to use the … trademark," but imported without the consent of the United States mark holder, were "authentic," not counterfeits. 112 F.3d 1296, 1306 (5th Cir. 1997) (citing 15 U.S.C. § 1116(d)(1)(B)). That was so, said the court, because the foreign manufacturer "was of course authorized to place its own trademark on its own goods at the time of its own manufacture," and so the goods were not counterfeit. *Id.*

In *Island Fund Management, Inc. v. RWS, Inc.*, the court explained that "to establish counterfeiting, a plaintiff must establish [that] … the defendant must not have been authorized to use the mark at the time the goods or services were manufactured or produced." 2019 WL 1466707, at *4 (S.D. Fla. Feb. 11, 2019), *report and recommendation adopted*, 2019 WL 1468540 (S.D. Fla. Mar. 12, 2019); *see also Knature Co. v. Duc Heung Grp., Inc.*, 2021 WL 3913194, at *5 (C.D. Cal. July 2, 2021) (defendant did not use "counterfeit

mark" because authorized uses of mark are not counterfeits); *AL Infinity, LLC v. Crown Cell, Inc.*, 2023 WL 5097979, at *6 (S.D.N.Y. Aug. 9, 2023) (explaining "if a good is produced by an authorized manufacturer, it is not considered to be counterfeit," and quoting section 1116(D)(1)(B) and the summary-judgment order in this case). And in interpreting the identical definition of "counterfeit mark" in a criminal provision, the Fourth Circuit explained that the language "makes clear that Congress did not intend to criminalize … the use of genuine and unaltered marks on goods that were manufactured by or for the mark holder." *United States v. Cone*, 714 F.3d 197, 207, 209 (4th Cir. 2013).[4]

Courts regularly instruct on this definition. For example, in *Farouk Systems, Inc. v. Costco Wholesale Corp.*, the court instructed that to win on its counterfeiting claim, the plaintiff "must prove that the [allegedly counterfeit goods] at issue in this lawsuit were not manufactured by [the plaintiff] or by a manufacturer or producer authorized by [the plaintiff] at the time of manufacture or production to use [plaintiff's] trademarks." Jury Charge at 5, No. 4:09-

[4] At the time of *Cone*, the criminal definition was found at 18 U.S.C. § 2320(e)(1)(B). It is now found at 18 U.S.C. § 2320(f)(1) and reads identically to the civil definition at 15 U.S.C. § 1116(D)(1)(B).

cv-03499 (S.D. Tex. Oct. 12, 2011), Dkt. 81. And in *Romag Fasteners, Inc. v. Fossil, Inc.*, the court included the entire statutory text in its jury charge and made clear that the "[p]laintiff must prove by a preponderance of the evidence that … the mark was affixed without [the plaintiff's] permission." Jury Instructions at 13, No. 3:10-cv-1827 (D. Conn. Apr. 2, 2014), Dkt. 410; *see also* Jury Instructions at 27, *Atari Interactive, Inc. v. Redbubble, Inc.*, No. 4:18-cv-03451 (N.D. Cal. Nov. 4, 2021), Dkt. 252 ("[T]he plaintiff must prove … [t]he defendant intentionally used in commerce a 'counterfeit mark[.]' … [A] mark is a 'counterfeit mark' when … [t]he accused use is not on or in connection with goods of which the producer was, at the time of production, authorized by the holder of the mark to use the mark for those types of goods.").

3. The district court shared this understanding until the jury charge conference. For years the court recognized that whether an authorized factory made the allegedly counterfeit bags was relevant to the counterfeiting claim. During discovery, the court ordered Chanel to "certify," "[w]ith respect to each item Chanel claims is counterfeit … that it has admissible evidence that the item *was not made in a factory which made genuine Chanel products*." J.A.527 (emphasis added).

Nearly two years later, in its summary-judgment order, the court again found it "important to observe that there is a special definition of 'counterfeit.'" J.A.598 n.9. Per this "special definition," the court explained, "a shoe which is made in the manufacturer's factory, and meets its specifications, but is unauthorized for sale, is an infringement, *but not a counterfeit*." J.A.598-99 n.9 (emphasis added); *see also El Greco Leather Prods. Co., v. Shoe World Inc.*, 806 F.2d 392, 395-96 (2d Cir. 1986) (sale of shoe made to mark holder's specifications in manufacturer's factory but not authorized for sale is infringement).

The district court abruptly reversed course at the charge conference. WGACA had proposed an instruction tracking the statutory definition that read in relevant part: "A counterfeit handbag is one that is a copy and not an original and one that was not manufactured by a factory authorized by Chanel to make Chanel handbags." J.A.660. The court's draft instructions likewise stated that a "counterfeit handbag was not manufactured by a factory authorized by Chanel to make Chanel handbags." J.A.3954.

Chanel objected to the draft instruction at the charge conference. In response, the court proposed to "take out that sentence." J.A.3955. WGACA protested that the sentence was "part of your definition, … that if it's made in a[n authorized] factory" it was not counterfeit. J.A.3955. The court, agreeing

with Chanel, responded, "no." J.A.3955. Erasing any remaining ambiguity, the court explained the draft language Chanel wanted removed was merely "a handy way of dealing with the problem in practical terms," and was "not required by the law." J.A.3955.

That language *is* required by the law. It is literally in the statute. Section 1116(D)(1)(B) mandates that handbags "manufactured by a factory authorized by Chanel to make Chanel handbags" are not counterfeits. J.A.660. Because "some evidence support[ed]" WGACA's claim that the marks were not counterfeit and that it did not willfully sell counterfeits, it was entitled to an instruction. *Harris v. O'Hare*, 770 F.3d 224, 238 n.9 (2d Cir. 2014), *as amended* (Nov. 24, 2014) (cleaned up). There was evidence that thirteen of the fourteen handbags were made in the Corti factory or that WGACA could have believed they were. *See infra* pp.33-37. By failing to instruct the jury on the *complete* definition of a "counterfeit mark," the district court erred.

4. The rest of the instruction did not cure this error. The final instruction taught only that a "counterfeit handbag is so close a copy that it is difficult to tell it from the original." J.A.3988. The court suggested at the charge conference that it believed the word "copy" captured the statutory definition. It explained that its definition of counterfeit was "that they are not a genuine

product but one so close to it that it's hard to tell the difference," or "a copy." J.A.3955. Stating what it apparently thought was obvious, the court declared that a "copy is not made in a factory." J.A.3955.

But the word "copy" is not found in the Lanham Act's definition of a counterfeit. To the contrary, the statute recognizes that copies and counterfeit marks are different—someone who uses a "copy" of a mark can be liable for *infringement*, 15 U.S.C. § 1114(1)(a) (listing use of *either* "counterfeit" or "copy" as an infringing act), while only use of a *counterfeit mark* qualifies for additional penalties, *id.* § 1117(b).

The court also did not tell the jury what a "copy" was. "[C]opy" suggests no specific origin, factory or otherwise. When a factory authorized to place a mark on a type of good manufactures a larger quantity of goods than authorized (*i.e.*, overruns, *see supra* p.25), it makes unauthorized "copies." But, under the statutory definition, those "copies" are not counterfeits. By not clarifying the meaning of "copy"—say, by noting that a "copy" cannot be made in an authorized factory—the district court left unanswered whether an authorized factory can produce a "copy."

As explained below, the answer to that question (which, per section 1116(D)(1)(B), was no) was the core of WGACA's defense. The court's failure

to provide an accurate definition was legal error. At a minimum, the court's incomplete instruction "gave a misleading impression or inadequate understanding of the law" on "a potentially dispositive issue in the case," requiring vacatur. *Restivo v. Hessemann*, 846 F.3d 547, 572 (2d Cir. 2017) (cleaned up).

**B. WGACA Was Entitled to the Proposed Instruction.**

Getting this instruction right was no mere formality: at every step of the case, WGACA argued that the bags at issue could not be counterfeits because they were made in the Corti factory, which Chanel authorized to make bags using Chanel's registered marks. At most, under WGACA's view of the case, the bags were infringing (because Chanel had not authorized their sale) but not counterfeit. By refusing to give an instruction on this dispositive issue, the court left WGACA unable to defend against Chanel's willful counterfeiting claim and the resulting award of statutory damages.

WGACA was "entitled to have the jury instructed as to" its "theories of law if supported by the evidence and brought to the attention of the court." *Boyce*, 464 F.3d at 389 (cleaned up). WGACA indisputably brought this theory to the court's attention. WGACA's original proposed jury instructions read in relevant part: "A counterfeit handbag is one that is a copy and not an original and one that was not manufactured by a factory authorized by Chanel to make

Chanel handbags." *See* J.A.660. WGACA again requested the instruction in its amended proposal on the eve of the charge conference. *See* J.A.1068. And throughout trial, WGACA insisted that the Corti theft was an "inside job," J.A.3965, and that "[e]very one of these products was actually manufactured in a Chanel factory," J.A.3423; *see also* J.A.3626, 3946.

WGACA also showed "that there is some evidence supporting the theory behind the instruction so that a question of fact may be presented to the jury." *Harris*, 770 F.3d at 238 n.9 (cleaned up). "It does not matter that the evidence was minimal or was presented in a piecemeal fashion." *Carvel Corp. v. Diversified Mgmt. Grp.*, 930 F.2d 228, 230 (2d Cir. 1991) (cleaned up). "All that [wa]s necessary" was that "there be *some* evidence supporting a party's theory of the case." *Id.* (emphasis added and cleaned up). WGACA clearly met this bar.

Chanel acknowledged that the Corti factory was authorized to make goods bearing Chanel's marks. *See, e.g.*, J.A.3576-77. Chanel also agreed that thirteen of the fourteen allegedly counterfeit bags bore serial numbers that Chanel originally allocated to the authorized Corti factory for use on Chanel bags. *See, e.g.*, J.A.3511 (acknowledging serial number in Exhibit 1369 was allocated to Corti factory), J.A.3988 (instructing jury on this fact). One of the

thirteen bags—a red handbag introduced as Exhibit 1369—was available for examination at trial. *See* J.A.7159.




Chanel's Director of Operations, Joseph Bravo, first testified that due to supposed anomalies in Exhibit 1369's "zipper pull," J.A.3512, and "stitching," J.A.3513, it was "a counterfeit bag," J.A.3514. Those issues, plus "discrepancies of the serial number," were "enough to declare that [the bag was] a counterfeit product." J.A.3514. No "Chanel factory would ever make a bag like" Exhibit 1369, Bravo testified. J.A.3514.

But also available at trial was a second red handbag, introduced as Exhibit 200, which WGACA purchased from a different secondhand seller. *See* J.A.4692, 3751.[5]




When he first examined Exhibit 1369, Bravo had not yet seen Exhibit 200. Instead, WGACA confronted Bravo with this second bag on cross-examination two weeks later.[6] J.A.3746. This second bag was so like Exhibit 1369 that

---

[5] WGACA is contemporaneously moving to lodge Exhibits 1369, 200, and 1374 (the brown pouch sold by WGACA that Chanel claimed was counterfeit) as physical exhibits with this Court.

[6] Due to a scheduling conflict, Bravo's testimony was non-sequential. J.A.3608.

Bravo could not easily tell the two apart on the stand. J.A.3749. Nevertheless, Bravo claimed that several components of Exhibit 200 were also non-genuine, including "[t]he color of the thread, of the stitching of the CC [mark]," and a different "color of the interior flap." J.A.3748.

But during WGACA's questioning, the district court ordered Bravo to look up Exhibit 200's serial number in ORLI. J.A.3750. Upon return, Bravo recanted, affirming that, per ORLI, Exhibit 200—a twin of Exhibit 1369—was indeed "a genuine Chanel handbag," J.A.3750, and was "manufactured by the Corti factory," J.A.3753. Had the court not ordered Bravo to check ORLI, Chanel would have continued to insist that Exhibit 200, which was identical in nearly every measure to Exhibit 1369, was counterfeit.

Bravo also had to recant his earlier testimony that the zipper pull on Exhibit 1369 was fake. J.A.3512-13. Upon his return to the stand, Bravo conceded that Exhibit 1369's zipper pull was genuine Chanel hardware, despite his previous insistence to the contrary. J.A.3749, 3753.

Critically, Bravo agreed that "it's impossible for the bad guys, the counterfeiters, to get original, genuine Chanel hardware because the supply chain is so tightly controlled." J.A.3603. Chanel's Italian counsel likewise testified (through deposition designations) that "Chanel is very careful to limit the

number of pieces of metal bits that are used for making bags[, s]o for counterfeiters, … it's impossible to get the original metal bits." J.A.3540.

Although the district court concluded after trial (in denying WGACA's Rule 50 motion) that "WGACA presented no evidence to support its proposition that the bags bearing voided Corti serial numbers were actually made in a Chanel factory," (SP.A.20), the court ignored these key facts. Bravo's recanting proved two critical facts. First, Chanel's own "experts" could not reliably determine whether a given bag was counterfeit or not. If Chanel's own experts could not reliably determine whether a bag was counterfeit without access to Chanel's internal database, how could WGACA have done so? Second, Exhibit 1369, which Chanel claimed was counterfeit, was likely made in the Corti factory. After all, Bravo eventually confirmed that Exhibit 1369 bore authentic Chanel hardware, and Exhibit 1369 was materially indistinguishable from Exhibit 200, which Bravo testified was made in the Corti factory and was genuine. From this evidence, the jury reasonably could have found that the Corti factory made (and perhaps sold without Chanel's authorization) bags bearing the at-issue serial numbers. Had the jury been told that any such bag could not be counterfeit, it likely would have reached a different verdict.

Notably, Chanel itself recognized the importance of this issue, because it proposed an instruction that "WGACA claims that certain items it sold fall under an exception that prevents them from being deemed 'counterfeit' under the law." J.A.1142. Its proposed instruction stated that if evidence demonstrated that the "item was manufactured or produced by a manufacturer or producer who was authorized by Chanel to use Chanel's trademarks for the type of item at issue," according to Chanel's specifications and while under Chanel's authorization, "then that item does not bear a 'counterfeit trademark.'" J.A.1142.

Because WGACA introduced "some evidence supporting [its] theory of the case," *Carvel*, 930 F.2d at 230 (quotations omitted), it was entitled to an instruction on the theory.

### C. The Error Gravely Prejudiced WGACA.

The error infected the jury's verdict and eviscerated WGACA's defense to the willful counterfeiting claim. The error left the jury without the tools to evaluate the evidence and rendered downstream questions of willfulness incomprehensible.

An error is harmless only if this Court can be "convinced that the error did not influence the jury's verdict." *LNC Invs., Inc.*, 173 F.3d at 462

(quotations omitted). That is impossible here. Without clear explanation that authorized factories cannot produce counterfeits, the jury had "no legal context in which to assess the significance" of WGACA's evidence. *Carvel*, 930 F.2d at 231. Without an instruction on the statutory definition, the jury could not understand the legal relevance of WGACA's insistence that the allegedly counterfeit bags came from the Corti factory or its demonstration that at least one such bag was identical to a genuine Corti bag. The jury remained free to conclude—contrary to the statute—that even if the Corti factory made the bags, they were still counterfeits. The jury thus lacked "sufficient instruction to enable it to assess the evidence within the proper legal framework and reach a rational verdict." *Pitasi v. Stratton Corp.*, 968 F.2d 1558, 1563 (2d Cir. 1992).

Without an accurate definition of a counterfeit, the jury also could not coherently determine whether WGACA "act[ed] willfully, with reckless disregard, or with willful blindness in its sale" of the allegedly counterfeit bags. J.A.1170. The court instructed that, to prove willfulness, Chanel needed to show "either that WGACA was actually aware of the infringing activity or that WGACA's actions were the result of reckless disregard for, or willful blindness to, Chanel's rights." J.A.3987.

How could the jury evaluate whether WGACA was aware of counterfeiting activity, or whether WGACA acted with reckless disregard or willful blindness, if the jury did not understand what a counterfeit is? As discussed above, WGACA presented evidence that one of the allegedly counterfeit bags looked materially identical to a bag that Chanel conceded was made in the Corti factory, *see supra* pp.35-37—a fact highly relevant to WGACA's lack of willfulness. After all, from WGACA's perspective, the handbags had genuine serial numbers and appeared indistinguishable from other bags made at the Corti factory; WGACA had no way of knowing about the heist. If the jury erroneously thought that bags made in the Corti factory could be counterfeits because they were "copies," it would not have appreciated the significance of this evidence to WGACA's intent. Because the jury could not meaningfully determine whether a given bag bore counterfeit marks, it likewise could not answer whether WGACA's conduct with respect to those bags was willful.

The court's eleventh-hour decision to cut half the statutory definition was legally wrong and deeply prejudiced WGACA. This Court should vacate and remand for a new trial on the counterfeiting claim.

## II. THE COURT'S EXCLUSION OF EVIDENCE OF CHANEL'S WITNESSES' BIAS REQUIRES A NEW TRIAL.

The district court abused its discretion in precluding WGACA from introducing evidence about Chanel's hostile approach to the secondhand market that would have undermined the credibility of Chanel's witnesses. As discussed above, a year before filing this lawsuit in 2018, Chanel identified the growth of luxury secondhand sellers like WGACA as a problem that could "become[] huge and a real threat." J.A.976; *see supra* p.13. According to internal corporate documents, more than half of Chanel's "core luxury clients" had bought or considered buying secondhand merchandise, J.A.924, and Chanel feared the secondhand market would "cannibaliz[e]" its business and "dilut[e] [its] authority." J.A.971, 976; *see also* J.A.981 (noting Chanel's desire to avoid "legitimating" and "creat[ing] value for" the secondhand market).

Rather than compete or cooperate with the secondhand market, Chanel opted to "tackle" the "threat[]" through "legal action," barraging secondhand sellers with 15 cease-and-desist letters and filing three lawsuits between 2014 and 2017. J.A.901, 922. In 2018, Chanel filed at least two more lawsuits against

luxury resellers, suing The RealReal and WGACA. *See Chanel, Inc. v. The RealReal, Inc.*, 1:18-cv-10626 (S.D.N.Y. filed Nov. 14, 2018).[7]

The district court granted Chanel's pretrial motion to preclude WGACA from introducing evidence of Chanel's anticompetitive and hostile approach to the secondhand market, including the internal documents discussed above. Despite WGACA's argument that the evidence was "highly relevant" to the credibility of Chanel's witnesses, J.A.883-85, the court summarily reasoned that the evidence would "provide no help in deciding the trial disputes over claims that WGACA infringed Chanel's trademarks." SP.A.2.

But that evidence was clearly relevant: Chanel's witnesses were deeply biased in service of Chanel's hostile approach to the secondhand market for business reasons, a fact hidden from the jury. Instead, key witnesses for Chanel misleadingly testified about Chanel's approach to the secondhand market and its motivations in taking legal action against WGACA. And another witness, Bravo, repeatedly misidentified genuine Chanel bags and components as counterfeit—demonstrating a predisposition to provide testimony that would

[7] In response, The RealReal filed antitrust counterclaims challenging Chanel's "aggressive campaign of exclusionary and anticompetitive conduct" against the secondhand market, including WGACA. *See* Am. Ans. 18, 25, *Chanel, Inc. v. The RealReal, Inc.*, No. 1:18-cv-10626 (S.D.N.Y. Feb. 25, 2021), Dkt. 120.

drive WGACA from the market. The court's repeated refusal to permit WGACA to undermine these witnesses' credibility with evidence of Chanel's anti-secondhand agenda was an abuse of discretion. And because the Chanel witnesses' misleading testimony so pervaded the trial, it is "likely" that the jury's judgment was "in some material respect … swayed by the error." *Perry*, 115 F.3d at 150 (cleaned up).

### A. The District Court Abused Its Discretion in Excluding Evidence Showing the Bias of Chanel Witnesses.

The admissibility of evidence regarding a witness's bias "is limited only by the relevance standard of Rule 402" and the balancing inquiry of Rule 403. *United States v. Thompson*, 359 F.3d 470, 475 (7th Cir. 2004) (quotation omitted). Evidence of bias is "almost always relevant." *United States v. Abel*, 469 U.S. 45, 52 (1984). That is because a biased witness might be inclined to "slant, unconsciously or otherwise, his testimony," and "the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *Id.* "Evidence of all facts and circumstances which tend to show that a witness may shade his testimony for the purpose of helping to establish one side of a cause only, should be received." *United States v. Haggett*, 438 F.2d 396, 399 (2d Cir.

1971) (cleaned up); *see United States v. Harvey*, 547 F.2d 720, 722-23 (2d Cir. 1976).

This Court's ruling in *Palin v. New York Times Co.*, 113 F.4th 245 (2d Cir. 2024), is illustrative. There, this Court held that the district court abused its discretion by excluding evidence that was relevant to a key witness's "potential bias" against the plaintiff (among other errors). *Id.* at 274-76. The excluded evidence might have led a "reasonable juror" to infer that the witness had "reason to personally dislike" the plaintiff—an inference that "would likely bear upon the credibility of [the witness'] assertions" at trial. *Id.* at 275. Because the district court improperly "discounted the evidence's probative value" and failed to articulate "countervailing prejudice" to the defendant, its exclusion of the bias evidence "further warrant[ed] a new trial." *Id.*

So too here. Chanel's witnesses had reason to slant their testimony against WGACA to further Chanel's *business* goal of undermining the secondary market. The testimony of three key Chanel witnesses—Joyce Green, Jennifer Bleys, and Joseph Bravo—exemplified the problem with the district court's exclusion. Their testimony was littered with misleading statements slanted in Chanel's favor—statements that the court's order prevented WGACA from properly impeaching.

*Joyce Green.* Chanel called Joyce Green, its managing director for France and former general manager for U.S. fashion, as its first witness. Green described the company's legal enforcement actions as driven by benign brand protection objectives, omitting its anticompetitive, anti-secondhand strategy. She testified about her motivations in "enforcement or policing of Chanel's brand image," stating that she and Chanel's employees "have a strong desire to protect the brand, to be aware of when the brand is positioned in ways that are not authorized, when our trademark is used without our permission, and to curate and make sure that the brand is positioned in the best way at all times." J.A.3427. Green's testimony prompted the district court to advise Chanel that it was "close" to introducing evidence excluded under its own pretrial motion. J.A.3427. The jury deserved to know that Green knew that Chanel used legal action to achieve another goal: "tackl[ing]" the threat of the secondhand market. J.A.903.

Later, Green flatly denied that Chanel takes issue with the secondhand sale of Chanel items, J.A.3454—testimony contradicted by internal company materials shared with Green that described, in Chanel's own words, that the secondhand market posed a "[r]isk of cannibalization threatening our business model." J.A.899.

*Jennifer Bleys*. Bleys, Chanel's former assistant general counsel who spent eight years at the company, also gave misleading testimony about Chanel's motivations for taking action against WGACA, claiming that the "primary purpose" of Chanel's cease-and-desist letter to WGACA was to remove an allegedly counterfeit handbag from WGACA's website. J.A.3618; *see also* J.A.3793 (Bleys claiming that Chanel's "primary purpose" in identifying allegedly counterfeit merchandise is to prevent buyers from attributing low-quality products to Chanel). Bleys did not disclose that Chanel had sent at least 15 cease-and-desist letters to sellers of secondhand Chanel products. *See supra* p.13. Evidence that Chanel had an ulterior, anticompetitive purpose in targeting WGACA for a miniscule number of allegedly counterfeit handbags would have undermined Bleys' testimony, casting doubt on her credibility.

Bleys also provided misleading testimony describing Chanel's approach to the secondhand market. She stated that Chanel does not sue secondhand retailers who demonstrate "cooperation," because "[i]f they cooperate, we wouldn't have brought a lawsuit." J.A.3794. And Bleys testified that the company does not help resellers authenticate Chanel bags because doing so would be "completely unfeasible," J.A.3798—leaving out the fact that (as the excluded evidence demonstrated) Chanel had experimented with training

secondhand retailers to authenticate its merchandise, J.A.966. Rather than continue to do so, Chanel sought to limit cooperation for the alternative reason that it did not want to "creat[e] value for second hand players." J.A.985.

The court's pretrial ruling unfairly prevented WGACA from impeaching these slanted statements by showing the jury evidence of Chanel's anticompetitive approach to the secondhand market. Even when WGACA asked the court to revisit its ruling in light of Bleys' misleading testimony, the court refused. During Bleys' cross-examination, WGACA argued that her testimony had "opened the door" to evidence regarding Chanel's anti-secondhand strategy, but the court again forbade WGACA from impeaching Bleys. J.A.3798.

*Joseph Bravo.* As described *supra*, pp.34-37, Bravo, a thirty-five-year Chanel veteran, J.A.3495, insisted that the zipper pull on one of the allegedly counterfeit Corti bags, Exhibit 1369, was fake until contrary evidence forced him to recant. J.A.3512-13, 3749, 3753. Similarly, he insisted that a genuine Chanel handbag contained non-genuine components until asked to search ORLI, which confirmed it was authentic. J.A.3748, 3750. Evidence that Chanel wanted to eliminate the secondhand market would have explained Bravo's inclination to declare each bag counterfeit until proven wrong.

Due to the court's pretrial order, these witnesses' distorted narrative remained unrebutted. By simply dismissing this evidence as irrelevant to "claims that WGACA infringed Chanel's trademarks," SP.A.2, the district court improperly discounted its relevance to the credibility of Chanel's key witnesses. *See also U.S. ex rel. MC2 Sabtech Holdings, Inc. v. GET Eng'g Corp.*, 2025 WL 391389, at *15 (S.D. Cal. Feb. 4, 2025) (plaintiff's "motivations for bringing this lawsuit were not relevant to any claim or defense available at trial," but "[t]hat testimony haven been given, however, [d]efendants were entitled to cross-examine him, to explore questions of bias and interest, and to seek to impeach his asserted reasons for bringing the lawsuit"); *Lobato v. Gomez*, 2017 WL 931824, at *4 (E.D. Cal. Mar. 8, 2017) (admitting proof of plaintiff's other lawsuits because of their "potentially … high probative value" in undermining the truth of her statements). *Cf. Manbro Energy Corp. v. Chatterjee Advisors, LLC*, 2023 WL 2563054, at *5 (S.D.N.Y. Mar. 17, 2023) (precluding admission of evidence of plaintiff's motives because that evidence did not "tend[] to undermine the credibility of a key witness"). And the court did not articulate any countervailing prejudice that would have justified excluding this probative evidence. *See Palin*, 113 F.4th at 275. The court's

exclusion of evidence relevant to the bias and credibility of Chanel's witnesses was an abuse of discretion.

### B. The Exclusion Prejudiced WGACA.

The issue of Chanel's approach to the secondhand market permeated the trial. From its opening statement, Chanel tried to convince the jury that it merely sought to enforce rules of fair play in the secondhand market, rather than to destroy it. J.A.3420 ("This case is not about whether someone can sell a used Chanel handbag or their mother's fur coats."). And Green, Bleys, and Bravo were crucial witnesses, providing extensive testimony supporting the company's claims against WGACA. Bravo's testimony, for example, formed the bedrock of Chanel's claim that the bags with Corti serial numbers were counterfeit. J.A.3978-79.

The witnesses' testimony was particularly relevant to the jury's willfulness determinations. Bleys, for example, portrayed WGACA as uniquely uncooperative in the face of Chanel's cease-and-desist letter asserting that it had identified an allegedly counterfeit bag on the platform. *See* J.A.3794 ("Q: And with those other secondhand retailers, have there been lawsuits? A. Not with cooperation. If they cooperate, we wouldn't have brought a lawsuit."). Evidence showing that Bleys was hiding Chanel's anticompetitive approach to

the secondhand market would have cast doubt on her narrative of WGACA's intransigence.

Green smeared WGACA on the stand, claiming WGACA had "been *found* to sell counterfeits." J.A.3448 (emphasis added). The court declared that Green had engaged in "open and flagrant contempt" of the court's pre-trial order prohibiting Chanel from arguing that the court had adjudged WGACA liable at summary judgment. J.A.3449, 3451. The court was so troubled by her testimony that it told Chanel it was "flirting with a mistrial," J.A.3449, although it ultimately denied a mistrial, J.A.3450-52. If the jury had known Green's bias against WGACA, it would have viewed her inflammatory testimony that WGACA had been "found to sell counterfeits" with skepticism.

Furthermore, evidence that Chanel treated WGACA as a competitive "threat" it needed to "tackle" likely would have altered the jury's perception of WGACA's reaction to Chanel's initial cease-and-desist letter. *See supra* pp.13-14. And very little evidence otherwise supported the jury's findings that WGACA willfully sold counterfeit bags: Chanel offered no evidence demonstrating that WGACA could have known that Chanel had voided the serial numbers from the Corti heist, or even that the heist had occurred at all, until after Chanel initiated this lawsuit.

Precluding the jury from hearing evidence of witnesses' bias is particularly likely to sway the jury's factfinding. A witness's bias "colors every bit of testimony given by the witness whose motives are bared." *Harvey*, 547 F.2d at 722 (quotations omitted). Because it is "likely that in some material respect the factfinder's judgment was swayed by the error," vacatur of the counterfeiting verdict is required. *Perry*, 115 F.3d at 150 (cleaned up).

## III. THE STATUTORY DAMAGES AWARD VIOLATES THE DUE PROCESS CLAUSE.

The $4 million statutory damages award shocks the conscience. WGACA is a legitimate business that works tirelessly to sell only authentic pre-owned bags. Chanel alleged that WGACA sold only *fourteen* counterfeit bags—out of roughly *70,000* Chanel bags sold during a nine-year period—infringing two Chanel marks. The jury's unparalleled award of $285,714 per allegedly counterfeit bag defies any semblance of reason or relation to WGACA's purported wrongdoing.

Two constitutional standards apply to review of these damages: (1) *Williams* and (2) *Gore*. Under either measure, the award violates the Due Process Clause.

### A. The Award Violates the *Williams* Standard.

While a statutory range may "mitigate[] the risk of a truly untethered award," *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 635 (S.D.N.Y. 2018) (citation omitted), a within-range statutory damages award can nevertheless violate the Due Process Clause. Even though courts review in-range awards with deference, such an award violates the Due Process Clause when it is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, Iron Mountain & S. Ry. Co. v. Williams*, 251 U.S. 63, 66-67 (1919). That standard applies to awards under the Lanham Act.[8]

To be sure, it will be the rare case where a within-range statutory damages award violates due process. This is that case. The damages awarded here are wholly disproportionate to WGACA's "offense" and are patently unreasonable. WGACA's "offense" was miniscule: WGACA sold a mere fourteen bags that Chanel determined were counterfeit—based solely on reference to

[8] *E.g.*, *Top Tobacco, L.P. v. Star Imps. & Wholesalers, Inc.*, 2024 WL 1190758, at *5 (N.D. Ga. Feb. 20, 2024), *aff'd*, 135 F.4th 1344 (11th Cir. 2025); *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 2010 WL 5598337, at *13 (N.D. Cal. Mar. 19, 2010), *aff'd in part, award vacated*, 658 F.3d 936 (9th Cir. 2011); *see also Coach, Inc. v. Celco Customs Servs. Co.*, 2014 WL 12573411, at *23-24 (C.D. Cal. June 5, 2014) (acknowledging *Williams*' applicability to Lanham Act awards).

Chanel's own ORLI database to which WGACA lacked access—while hiding from the public that thirteen of those serial numbers supposedly had been stolen and declared void. JA.1170, 3741, 3786-87.

These fourteen bags represent a trivial .02% of WGACA's sales of over 70,000 Chanel-branded handbags between 2014 and 2023. J.A.4102. But the statutory damages represent over 30% of WGACA's *total profit* attributable to sales of *all* Chanel goods for that period. J.A.4078. What is more, the statutory damages award dwarfs many times over any actual damages to Chanel. At no point did Chanel even try to quantify any damage from WGACA's sales of the bags. *See, e.g.*, J.A.4076.

Even the .02% percentage of WGACA's Chanel-related sales overstates the seriousness of the offense. Chanel agrees that thirteen of those fourteen bags carried legitimate Chanel serial numbers—albeit serial numbers that Chanel voided internally following their alleged theft from the Corti factory. *Supra* p.33. Only the fourteenth bag, a brown pouch bearing one of the two at-issue marks, was linked in WGACA's records to a serial number that Chanel claimed it had never issued to that bag. But that bag's provenance was difficult to determine conclusively: the pouch itself did not contain any serial number. Instead, the serial number had been removed during the repair process at a

Chanel boutique, a process Chanel agreed was common and would include verification of the bag's authenticity. J.A.3603. Accordingly, none of the fourteen bags was obviously counterfeit; an award at the statutory maximum—generally wielded against only the most heinous of offenders—is wholly unconnected from WGACA's offense.

The severity of the statutory damages award becomes even starker when considering WGACA's business model. WGACA is no back-alley counterfeiter; it maintains a "genuine and dedicated resolve that" it does not "want to ever buy or sell a bag that's not authentic." J.A.3922. The record reveals no pattern of repeated misconduct, no flood of fake merchandise, and no deliberate deception.

That contrasts with other awards of comparable size. Take, for example, other awards of $4 million. The court in *Burberry Ltd. v. Euro Moda, Inc.* awarded that amount only after the defendant admitted to purchasing and selling nearly 84,000 counterfeit items. 2009 WL 4432678, at *1-2 (S.D.N.Y. Dec. 4, 2009), *report and recommendation adopted*, No. 8-cv-5781 (S.D.N.Y. Jan. 5, 2010). Notably, though, the court *declined* the plaintiff's request to award the $2 million per mark per type of good maximum, instead awarding just $1 million per mark per type of good. *Id.* at *3, *5-6. Similarly, in *Nike,*

*Inc. v. Top Brand Co*., it took *1.2 million counterfeit items* to warrant $4 million in statutory damages. 2006 WL 2946472, at *3 (S.D.N.Y. Feb. 27, 2006), *report and recommendation adopted*, 2006 WL 2884437 (S.D.N.Y. Oct. 6, 2006).[9]

Or consider comparable awards for a similar number of infringed marks. In another case, the same court found that willful counterfeiting of three Coach marks necessitated $20,000. *Coach Servs., Inc. v. K Ya Int'l, Inc*., 2010 WL 2771897, at *3 (S.D.N.Y. June 10, 2010), *report and recommendation adopted*, 2010 WL 2771907 (S.D.N.Y. July 12, 2010). For willful counterfeiting of five trademarks and four types of goods, another court awarded $200,000. *Coach, Inc. v. Ocean Point Gifts*, 2010 WL 2521444, at *5-8 (D.N.J. June 14, 2010).

Other cases involving Chanel resulted in substantially lesser damages. *E.g.*, *Chanel, Inc. v. Banks*, 2011 WL 121700, at *7, 14 (D. Md. Jan. 13, 2011), *amended report and recommendation adopted*, No. 9-cv-843 (D. Md. Feb. 4,

[9] *See also Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 164, 167-70 (S.D.N.Y. 1999) ($750,000 in statutory damages for more than 5,000 "Coach look-alike" bags "and the stamping machinery to turn them into finished counterfeits"); *Louis Vuitton Malletier v. Artex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 358 (S.D.N.Y. 2010) (rejecting request for $4 million and awarding $72,000 for sale of "2,000 to 4,000" counterfeit bags).

2011) (awarding $84,000 in statutory damages for at least 35 counterfeit bags and wallets); *Chanel, Inc. v. French*, 2006 WL 3826780, at *5 (S.D. Fla. Dec. 27, 2006) (awarding $280,000 in statutory damages for use of seven counterfeit trademarks on two types of goods).

These cases make clear that "most judges have issued awards well below the maximums available on the basis of a per-mark[ ]per-type-of-goods" calculation. *Banks*, 2011 WL 121700, at *11 (quotations omitted). That aligns squarely with the Lanham Act's purpose: "the broader measure of damages available by statute is intended to address situations involving 'sophisticated, large-scale counterfeiters.'" *Id.* (quoting S. Rep. No. 104–177 (Nov. 28, 1995)). Clearly, WGACA is not that. WGACA is a reseller of pre-owned goods, not a counterfeiter. Against this backdrop, the jury's massive statutory damages award defies constitutional bounds.

### B. The Award Violates the *Gore* Standard.

Alternatively, the statutory damages award was so punitive as to trigger *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). This Circuit has cautioned that the *Gore* standard may apply in cases where statutory damages are "so far beyond the actual damages suffered" that they "resemble punitive

damages." *Parker v. Time Warner Ent. Co.*, 331 F.3d 13, 22 (2d Cir. 2003) (statutory damages under Cable Communications Policy Act).

Enhanced statutory damages under the Lanham Act—like those awarded here—can be punitive, as courts in this Circuit have recognized.[10] Other courts agree.[11] Where such statutory damages are "grossly excessive," there is a risk of a due process violation. *See Murray v. Cingular Wireless II, LLC*, 242 F.R.D. 415, 421 (N.D. Ill. 2005).

Under *Gore*, this Court examines the award in light of "(1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the actual harm inflicted, and (3) 'the difference between this remedy and the civil penalties authorized or imposed in comparable cases.'" *Stampf v.*

---

[10] *See, e.g.*, *Glob. Van Lines, Inc. v. Glob. Moving Express, Inc.*, 2007 WL 7769395, at *5 (S.D.N.Y. Aug. 20, 2007) (report and recommendation) ("Statutory damages awarded under the Lanham Act serve as a punishment. ... As such, they are akin to punitive damages."); *Sara Lee*, 36 F. Supp. 2d at 165 ("[Section] 1117(c) provides both compensatory and punitive relief."); *Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*, 2010 WL 2133937, at *10 (E.D.N.Y. Mar. 11, 2010), *report and recommendation adopted*, 2010 WL 2160058 (E.D.N.Y. May 27, 2010) ("Statutory damages awards are intended to be both compensatory and punitive.").

[11] *See, e.g.*, *French*, 2006 WL 3826780, at *2 n.2 ("While § 1117(c) looks to compensatory considerations … it also looks to punitive considerations." (quotations omitted)); *Beachbody, LLC v. Johannes*, 2011 WL 3565226, at *3 (C.D. Cal. Aug. 12, 2011) ("[I]nquiries under Section 1117(c) look to both compensatory … and punitive … considerations.").

*Long Island R.R. Co.*, 761 F.3d 192, 209 (2d Cir. 2014) (citation omitted). Each factor weighs heavily against the $4 million award.

First, WGACA acknowledges—although vehemently disagrees with—the jury's finding of willfulness. But even assuming willfulness as to the sale of these fourteen bags, WGACA's conduct was hardly consistent with the morally culpable behavior the standard contemplates. Again, WGACA is not a counterfeit manufacturer and runs a business premised on the sale of authentic luxury goods. Selling fourteen bags found to be counterfeit was not the kind of reprehensible conduct that has warranted large awards of statutory damages, *see supra* pp.54-56, especially given the difficulty in concluding any of the fourteen was counterfeit, *see supra* pp.53-54.

Second, the "disparity" between the award and any harm to Chanel is vast. *Gore*, 517 U.S. at 575. "[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). In *Gore* and *Campbell*, awards of 500 times and 145 times the compensatory-damages award, respectively, violated due process. *Gore*, 517 U.S. at 582; *Campbell*, 538 U.S. at 425. Here, Chanel never sought actual damages. But consider an alternative measurement: the $12,739 in disgorgement

awarded. *See Curry v. Revolution Lab'ys, LLC*, 124 F.4th 441, 459 (7th Cir. 2024) (equitable remedies can be considered when calculating the punitive damage ratio); SP.A.27. Applying that measurement, the ratio is 314:1. That is an untenable disparity.

Finally, the differences between the award and those imposed in "comparable cases" are glaring. *Gore*, 517 U.S. at 575. As explained above, *supra* pp.54-56, the penalty imposed on WGACA towers over comparable cases and is more in step with cases involving sophisticated, large-scale counterfeiters making and selling *thousands* of bags. WGACA cannot be deemed ten or a hundred times more blameworthy than other comparable sellers. The award violated due process.

## IV. THE DISTRICT COURT ERRED IN AWARDING UNRECOVERABLE "COSTS."

The district court erred in awarding Chanel $560,978.97 in "costs" for legal research and electronic discovery expenses. SP.A.13-17. Chanel moved for these "costs" as part of its requested attorneys' fees. Because the court held that Chanel failed to prove the "exceptional" circumstances required for a fee award, it lacked authority to award these supposed "costs." And to the extent the court thought it was awarding "the costs of the action" under 15 U.S.C. § 1117(a), and not "fees," it erred, because legal research and electronic

discovery expenses are not recoverable costs. The Court should vacate the "costs" award.

### A. Chanel Requested "Costs" Only as Part of a Fee Award.

The Lanham Act permits the prevailing party to recover both "the costs of the action" and "in exceptional cases … reasonable attorney fees." 15 U.S.C. § 1117(a). Recoverable "costs" mirror the costs allowed by 28 U.S.C. §§ 1821 and 1920. *See Rimini Street, Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 340 (2019) ("A statute awarding 'costs' will not be construed as authorizing an award of litigation expenses beyond the six categories listed in [28 U.S.C.] §§ 1821 and 1920, absent an explicit statutory instruction to that effect."); *infra* pp.63-64.

To obtain attorneys' fees under the Lanham Act, a plaintiff must show that the case is "exceptional"—*i.e.*, that it "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202, 215 (2d Cir. 2019) (quotations omitted).

In addition to requesting $6,715,376.58 in attorneys' fees, Chanel's "motion for attorneys' fees" requested $560,978.97 in what it alternatively called "disbursements" or "costs." J.A.1776, 3151-53. The requested

"disbursements" were for legal research and electronic discovery expenses. J.A.3152. Chanel argued it was entitled to both fees and disbursements because the case was "exceptional." J.A.3130.

Chanel argued that its requested "disbursements" were properly considered "[a]s part of the attorneys' fees award." J.A.3151. It insisted that "[c]ourts award ESI [electronically stored information] hosting costs *as part of attorneys' fees awards*," JA.3152 (emphasis added) (citing authorities), and that "[c]ourts also award Lexis and Westlaw research charges *as part of attorneys' fees awards*," J.A.3152 (emphasis added) (citing authorities).

Chanel never argued that it was entitled to legal research and electronic discovery expenses as "costs" even if the case was not "exceptional." To the contrary, Chanel made clear that it planned to request costs in a bill of costs later. J.A.3152 n.9 ("Chanel intends to submit a notice of taxation of costs and bill of costs pursuant to Local Civil Rule 54.1."). It has not yet filed a bill of costs.[12]

[12] Under Rule 54(d)(1), costs other than attorneys' fees are submitted as a bill of costs, awarded by the clerk, and then can be reviewed by the court. The Southern District's local rules require that the bill of costs be filed with the clerk—not the judge—in the first instance. Local Civ. R. 54.1(a).

WGACA opposed the motion on the ground that this was not an exceptional case warranting fees. J.A.3197. In reply, Chanel again argued that this was an exceptional case and reaffirmed that its only requested relief was "that the Court grant the Motion for Attorneys' Fees." J.A.3237, 3245.

The court rejected fees, correctly holding that "[t]his is not an exceptional case." SP.A.13-17. The court noted that WGACA did not "flagrant[ly] violat[e]" the law, since "it is in WGACA's best interests to sell genuine CHANEL-branded goods," and the instances of willful infringement found by the jury "were a small percentage of WGACA's overall sales of CHANEL-branded items." SP.A.15-16. That conclusion is not at issue on appeal, as Chanel did not cross-appeal the denial of its attorneys' fees motion. But, after rejecting Chanel's request for fees, the court proceeded to award $560,978.97 in legal research and electronic discovery expenses as "costs of the action." SP.A.17.

The court erred in converting Chanel's fee request into a bill of "costs." As discussed above, Chanel requested "costs" only as part of the attorneys' fees award—not as independently taxable costs. Because the court concluded the case was not exceptional, it should have denied Chanel's requested "costs."

### B. The Court Erred in Awarding Chanel Fees in the Guise of "Costs."

Although the court appeared to think it was awarding legal research and electronic discovery expenses as "costs of the action," those expenses are not recoverable costs.

a. The "costs of the action" under 15 U.S.C. § 1117(a) are those costs specified in the general costs statutes, 28 U.S.C. §§ 1821[13] and 1920. As the Supreme Court explained in the context of the analogous Copyright Act, "[s]ections 1821 and 1920 create a default rule and establish a clear baseline against which Congress may legislate." *Rimini St.*, 586 U.S. at 339. "Consistent with that default rule, some federal statutes simply refer to 'costs.'" *Id.* In that situation, "federal courts are limited to awarding the costs specified in §§ 1821 and 1920." *Id.*; *see also Gortat v. Capala Bros., Inc.*, 795 F.3d 292, 296 (2d Cir. 2015). These are known as "taxable" costs. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 573 (2012).

The Lanham Act's costs provision—which generically refers to "the costs of the action"—is subject to *Rimini*'s default rule. Therefore "§ 1117(a) does not provide a basis for [Chanel] to recover costs beyond those specified

[13] Section 1821 provides reimbursement rates for witnesses' "[p]er diem and mileage" expenses. Chanel did not claim any such costs.

in 28 U.S.C. § 1920," or, to the extent relevant, section 1821. *Burberry Ltd. v. Yarbrough*, 2021 WL 5356757, at *8 (N.D. Ill. Nov. 17, 2021). Multiple courts have affirmed that Lanham Act "costs" are limited to those in sections 1821 and 1920. *E.g.*, *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, 2023 WL 8232072, at *5 (10th Cir. Nov. 28, 2023); *San Diego Comic Convention v. Dan Farr Prods.*, 807 F. App'x 674, 676-77 (9th Cir. 2020). No court has held otherwise.

b. Legal research and electronic discovery expenses are not taxable under sections 1821 and 1920. Nor do they qualify as "Taxable" in the Southern District's Local Rules. Local Civ. R. 54.1.

***Legal Research Fees***. This Court has squarely rejected the availability of legal research expenses under section 1920: "computer research … is not a separately taxable cost." *U.S. ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 173 (2d Cir. 1996); *accord Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 136, 150 (S.D.N.Y. 2000); *Jones v. Unisys Corp.*, 54 F.3d 624, 633 (10th Cir. 1995). Research expenses are simply "not deemed to be 'costs' under federal law." McCarthy § 30:107. As such, "[p]laintiffs cannot recompense their Lexis and Westlaw costs." *Tri-Star Pictures, Inc. v. Unger*, 42 F. Supp. 2d 296, 306 (S.D.N.Y. 1999).

***ESI Hosting and Processing***. This Circuit has not addressed whether and to what extent electronic discovery expenses can be taxed as costs. *See* S.D.N.Y. Local R. 54.1 cmt. (pre-2024); *accord Realtime Data, LLC v. CME Grp. Inc.*, 2014 WL 11820242, at *3-4 (S.D.N.Y. June 24, 2014), *aff'd*, 600 F. App'x 771 (Fed. Cir. 2015). To the extent that any ESI expenses are awardable, they are so under section 1920(4)'s provision for "the costs of making copies of any materials … for use in the case." 28 U.S.C. § 1920(4).

Chanel's broad requests for ESI "hosting" and "processing" expenses do not fit under section 1920(4). J.A.3152. Taxable costs under section 1920 "are limited to relatively minor, incidental expenses" and are "modest in scope." *Taniguchi*, 566 U.S. at 573. Several circuits have held that, of costs related to the "collection, processing, and production of electronically stored information[,] … only scanning and file format conversion can be considered to be 'making copies,'" under section 1920(4). *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 159-60 (3d Cir. 2012).

Other ESI-related discovery expenses, including hosting, are not recoverable. *See Country Vintner of N.C., LLC v. E. & J. Gallo Winery, Inc.*, 718 F.3d 249, 257-62 (4th Cir. 2013); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 927-28 (9th Cir. 2015); *U.S. ex rel. Barko v. Halliburton Co.*, 954

F.3d 307, 312 (D.C. Cir. 2020); *see also Balance Point Divorce Funding, LLC v. Scrantom*, 305 F.R.D. 67, 76 (S.D.N.Y. 2015) ("[J]ust as rental costs for storage of paper documents or housing and leasing photocopying equipment are not taxable as 'making copies,' costs for 'Hosting Active–Data' are not costs for making copies."). Chanel's generic requests for ESI "hosting" and "processing" expenses, J.A.3152, fail to identify any tasks that qualify as taxable costs of "making copies," 28 U.S.C. § 1920(4).

c. Instead, legal research and most electronic discovery expenses are recoverable only as a component of an attorneys' fees award. As Chanel argued below, "[c]ourts … award Lexis and Westlaw research charges as part of attorneys' fees awards." J.A.3152. This Court has explained that, because "computer research is merely a substitute for an attorney's time," it "is compensable under an application for attorneys' fees and is not a separately taxable cost." *Merritt Meridian Const.*, 95 F.3d at 173; *accord Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 369 F.3d 91, 98 (2d Cir. 2004) ("[T]he charges for such online research may properly be included *in a fee award*." (emphasis added)); *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 38 F.3d 1429, 1440-41 (7th Cir. 1994). Courts sometimes call these "costs," but they are still considered part of the "expenses incurred by

the attorney" and require a fee award. *E.g.*, *Walpert v. Jaffrey*, 2016 WL 11271873, at *18 (S.D.N.Y. Aug. 17, 2016), *report and recommendation adopted*, 2017 WL 1063461 (S.D.N.Y. Mar. 21, 2017). Because the district court denied attorneys' fees, Chanel was not entitled to its legal research expenses.

Likewise, if electronic hosting and processing expenses are recoverable at all, it would have to be on the theory that attorneys' fees "normally include those reasonable out-of-pocket expenses incurred by the attorney and which are normally charged fee-paying clients." *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987); *accord U.S. ex rel. Becker v. Tools & Metals, Inc.*, 2013 WL 1293818, at *10 (N.D. Tex. Mar. 31, 2013). Indeed, Chanel argued below that "[c]ourts award ESI hosting costs as part of attorneys' fees awards." J.A.3152.

Because Chanel's requested expenses were compensable only as part of an attorneys' fees award, and because the district court held that this was not an exceptional case warranting fees, the Court should vacate the "costs" award.

## CONCLUSION

The Court should remand for a new trial on the counterfeiting claim or, alternatively, vacate the statutory damages award under the Due Process Clause. The Court should also vacate the "costs" award.

Respectfully submitted,

/S/ *Amy Mason Saharia*


LISA S. BLATT
AMY MASON SAHARIA
ALEXANDER HELDMAN
DANA GOTFRYD
CLAIRE GRODEN
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, SW*
*Washington, DC 20024*
*(202) 434-5000*
*asaharia@wc.com*

PETER T. SHAPIRO
LEWIS BRISBOIS BISGAARD & SMITH LLP
*7 World Trade Center*
*250 Greenwich Street, 11th Fl.*
*New York, New York 10007*
*(212) 232-1300*


October 22, 2025

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Amy Mason Saharia, counsel for appellants and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4), that the attached Brief of Appellants is proportionately spaced, has a typeface of 14 points or more, and contains 13,760 words.

OCTOBER 22, 2025

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

## CERTIFICATE OF SERVICE

I, Amy Mason Saharia, counsel for appellants and a member of the Bar of this Court, certify that, on October 22, 2025, a copy of the attached Brief of Appellants and Special Appendix was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

OCTOBER 22, 2025

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

# 25-722

## In the United States Court of Appeals for the Second Circuit

CHANEL, INC.,
PLAINTIFF-APPELLEE

*v.*

WHAT COMES AROUND GOES AROUND LLC, DBA WHAT GOES AROUND COMES AROUND, MHW PROPERTIES, INC., PINES VINTAGE, INC., VINTAGE DESIGNS LTD., WGACA, LLC, WGACA WEB, LLC, WCAGA LA, LLC,
DEFENDANTS-APPELLANTS,

SETH WEISSER, GERARD MAIONE, WGACA WEB, LLC,
DEFENDANTS.

*On Appeal from the United States District Court for the Southern District of New York, No. 1:18-cv-2253, The Hon. Louis L. Stanton*

**SPECIAL APPENDIX**

AMY MASON SAHARIA
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, SW*
*Washington, DC 20024*
*(202) 434-5000*
*asaharia@wc.com*

*Counsel for Appellants*

**TABLE OF CONTENTS**

Order re: Motions *In Limine* (Sept. 20, 2023), Dkt. 361 .......... SPA-1

Final Judgment and Order Re: Equitable Relief (Feb 26, 2025), Dkt. 505 .......... SPA-4

Opinion and Order Denying Defendants' Rules 50(b) and 59 Motion and Denying and Granting in Part Plaintiff's Motion for Attorneys' Fees (June 26, 2025), Dkt. 537 .......... SPA-12

15 U.S.C.
§ 1114 .......... SPA-29
§ 1116 .......... SPA-29
§ 1117 .......... SPA-30
§ 1127 .......... SPA-31

ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/20/23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -X
CHANEL, INC.,

Plaintiff,

- against -

18 Civ. 2253 (LLS)

IN LIMINE ORDER

WGACA, LLC, WHAT COMES AROUND GOES AROUND LLC d/b/a WHAT GOES AROUND COMES AROUND, MHW PROPERTIES, INC., WGACA WEB, LLC, PINES VINTAGE, INC., VINTAGE DESIGNS LTD., and WCAGA LA, LLC,

Defendants.
- - - - - - - - - - - - - - - - - - - -X

The Parties' Motions in Limine are resolved as follows:

**Chanel's Motions in Limine:**

- Chanel No. 1 (Dkt. No. 310): The Motion in Limine is denied because direct proof may not be the only way of persuading a fact-finder that Chanel made the Chanel-branded items.
- Chanel No. 2 (Dkt. No. 312): The Motion in Limine is denied because evidence of WGACA's own processes is admissible whether or not the fact-finder finds that they have enough documentation.
- Chanel No. 3 (Dkt. No. 314): The Motion in Limine is denied because Plaintiff's concerns can be adequately handled on cross-examination, and Mr. Weisser has personal knowledge

of WGACA's business practices.

- Chanel No. 4 (Dkt. No. 316): The Motion in Limine is granted because the evidence regarding Chanel's motives will provide no help in deciding the trial disputes over claims that WGACA infringed Chanel's trademarks.
- Chanel No. 5 (Dkt. No. 318): The Motion in Limine is denied because the evidence is germane to the issues in the case.
- Chanel No. 6 (Dkt. No. 320): The Motion in Limine is granted under Federal Rule of Evidence 403.

**WGACA's Motions in Limine:**

- WGACA No. 1 (Dkt. No. 297): The Motion in Limine is denied because the Lanham Act is a law act, disgorgement is a law remedy, and counterfeit is a law concept.
- WGACA No. 2 (Dkt. No. 298): The decision is reserved for trial.
- WGACA No. 3 (Dkt. No. 299): The Motion in Limine is denied because Defendants' concerns can be adequately handled on cross-examination. However, there shall be no reference, direct or indirect, by any party, witness, lawyer, or trial participant to Rockwell Automation, Inc. v. Radwell Int'l, Inc., No. 1:15-cv-05246-RBK-JS (D.N.J.).
- WGACA No. 4 (Dkt. No. 300): The decision is reserved for trial.

Case: 25-722, 10/23/2025, DktEntry: 44.1, Page 83 of 112

- <u>WGACA No. 5 (Dkt. No. 301):</u> The decision is reserved for trial.
- <u>WGACA No. 6 (Dkt. No. 302):</u> The decision is reserved for trial.

Dated: New York, New York
September 20 2023

Louis L. Stanton
LOUIS L. STANTON
U.S.D.J.

ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/26/25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHANEL, INC.,

Plaintiff,

- against -

WGACA, LLC; WHAT COMES AROUND GOES AROUND LLC d/b/a WHAT GOES AROUND COMES AROUND; MHW PROPERTIES, INC.; WGACA WEB, LLC; PINES VINTAGE, INC.; VINTAGE DESIGNS LTD.; and WCAGA LA, LLC,

Defendants.

---

18 Civ. 2253 (LLS)

# FINAL JUDGMENT

On February 6, 2024, a jury found Defendants WGACA, LLC; WHAT COMES AROUND GOES AROUND LLC d/b/a WHAT GOES AROUND COMES AROUND; WGACA WEB, LLC; and WCAGA LA, LLC (collectively, "WGACA") liable to Plaintiff Chanel, Inc., for various claims of trademark infringement, false association, unfair competition, and false advertising under the Lanham Act and awarded statutory damages (Dkt. No. 407). The Court held a bench trial on equitable remedies in July 2024, after which Chanel moved for entry of an injunction against WGACA and disgorgement of WGACA's profits.

## I.

Having considered the parties' respective submissions, and in view of the comprehensive jury verdict finding WGACA liable on all counts, it is hereby ORDERED, ADJUDGED, AND DECREED that:

1) This injunction applies to Defendants WGACA, LLC; WHAT COMES AROUND GOES AROUND LLC d/b/a WHAT GOES AROUND COMES AROUND; WGACA WEB, LLC; WCAGA LA, LLC; and any entity affiliated with, or owned and/or controlled, in whole or in part, by any of the foregoing entities, as well as the partners, officers, agents, privies, shareholders, principals, directors, licensees, attorneys, servants, employees, affiliates, subsidiaries, successors, and assigns of the foregoing and all others in active concert or participation with any of them (collectively, the "Enjoined Parties").

2) For purposes of this injunction:

a) The term "Chanel" means and refers to Plaintiff Chanel, Inc., and any entity affiliated with, or owned and/or controlled, in whole or in part, by Plaintiff Chanel, Inc., and the partners, officers, agents, privies, shareholders, principals, directors, licensees, attorneys, servants, employees, affiliates, subsidiaries, successors, and assigns of the foregoing;

b) The term "CHANEL Marks" means and refers to the CHANEL word mark and the CC monogram mark, i.e., ;

c) The term "Chanel Stylized Font" means and refers to the following capital letter, sans serif font and stylization: **CHANEL**

3) As soon as possible, and no later than ninety (90) days from the issuance of this injunction, the Enjoined Parties are enjoined, and shall refrain, from:

a) Taking any action or course of conduct that is likely to cause confusion, or to cause mistake, or to deceive as to any affiliation, connection, or association of WGACA with Chanel, or as to the origin, sponsorship, or approval of WGACA's goods, services, or commercial activities by Chanel, including, but not limited to, taking the following actions in connection with WGACA's advertisement, promotion, distribution, or sale of goods:

i. Using any of the CHANEL Marks or any marks confusingly similar thereto to advertise or promote WGACA's products or business in a manner that is not nominative fair use and is likely to cause confusion as to any affiliation or sponsorship between Chanel and WGACA;

ii. Using the CHANEL word mark or any marks confusingly similar thereto in the Chanel Stylized Font;

iii. Using photographs or copies of Chanel runway and marketing campaigns and/or Chanel print advertisements bearing the CHANEL Marks or any marks confusingly similar thereto;

iv. Using any hashtags consisting of or including the word "Chanel," including, but not limited to, #chanel, #wgacachanel, #chanelgiveaway, and #giveawayfromchanel;

v. Using or displaying displays or props (e.g., large perfume bottles) in stores or at in-person or online events that bear any of the CHANEL Marks, any marks confusingly similar thereto, or other intellectual property owned by Chanel in any manner that conveys the impression that WGACA is related to Chanel;

vi. Using the word "Chanel" in discount codes;

vii. Using the name, image, likeness, or quotations of Gabrielle Bonheur "Coco" Chanel in a manner that is likely to cause confusion as to any affiliation or sponsorship between Chanel and WGACA;

b) Using any of the CHANEL Marks or any marks confusingly similar thereto in connection with WGACA's advertisement, promotion, distribution, or sale of CHANEL-branded items, other than to identify a particular item currently or previously offered for sale as made and sold by Chanel, or to the extent the specific item currently or previously offered for sale itself bears CHANEL Marks. In any such circumstance, the Enjoined Parties must ensure that no more of any of the CHANEL Marks is used than is necessary to identify the particular item being offered for sale. The Enjoined Parties must also prominently display, clearly and conspicuously, the following disclaimer on any webpage advertising or selling a CHANEL-branded item, or on physical tags where products are sold in person: "WHAT GOES AROUND COMES AROUND IS NOT AFFILIATED WITH CHANEL AND HAS NOT BEEN AUTHORIZED BY CHANEL TO SELL THIS ITEM." For any CHANEL-branded item being advertised and/or offered for sale online, the Enjoined Parties must post this disclaimer clearly and conspicuously on the individual product page, not merely at the bottom of the webpage, and that page must also list the CHANEL-branded item's Chanel Serial Number as it appears on the accompanying Authenticity

Card, Authenticity Plate, or label affixed to the actual CHANEL-branded item, provided that such product has or originally had a Chanel Serial Number;

c) Advertising, offering for sale, or selling any CHANEL-branded items that have not been authorized for sale by Chanel, including, but not limited to, point-of-sale items and retail props;

d) Advertising, offering for sale, or selling any CHANEL-branded items that have been materially altered or changed, including, without limitation, items that combine original and non-original Chanel parts. Re-dyeing a Chanel item the same color as the original shall not be deemed a material alteration;

e) Advertising, offering for sale, or selling genuine CHANEL-branded items that have been repaired, restored, or refurbished without fully disclosing on any webpage selling a CHANEL-branded item, or on physical tags where products are sold in person, the nature of the repair, restoration, or refurbishment. Minor changes in the form of polishing, cleaning, and other small preparations for sale shall not be considered repaired, restored, or refurbished;

f) Advertising, offering for sale, or selling any infringing items using or bearing CHANEL Marks,

Case: 25-722, 10/23/2025, DktEntry: 44.1, Page 90 of 112

including, without limitation, counterfeit CHANEL-branded handbags bearing Chanel Serial Number 10218184 and Chanel Serial Numbers falling within the range of the Chanel Authenticity Cards and labels that were voided after being stolen from the Renato Corti factory on November 29, 2012, i.e., Chanel Serial Numbers 17686401-17716400, and infringing CHANEL-branded handbags bearing Chanel Serial Numbers that were voided and listed on Trial Exhibit 1010, Subpart 3 (Chanel Serial Nos. 12082030, 13915669, 2280629, 2281657, 2387238, 2404646, 2417513, 2417568, 2417901, 2418017, 2418172, 2418439, 2418652, 2418831, 2584203, 2584648, 2632137, 2689201, 2689211, 2689264, 2740036, 2740046, 2763599, 2763906, 2766848, 2983538, 3045639, 3045652, 3045696, 3045896, 3046529, 3046829, 3046855, 3046855, 3046990, 3047180, 3047328, 3069972, 3188865, 3310094, 3498212, 3809450, 3810831, 3974501, 3983764, 4200378, 4927602, 5224946, 6953459, 7169916, 73841821 and 7384618);

g) Certifying, guaranteeing, or otherwise making any advertising claims, representations, or statements asserting the genuineness of any CHANEL-branded items advertised or sold by WGACA for which WGACA has no

records of its own authentication to support its authentication claims; and

h) Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (g) above.

II.

It is further ORDERED, ADJUDGED, AND DECREED that the Defendants shall pay $4,000,000 in statutory damages pursuant to 15 U.S.C. § 1117(c)(2) for the sale or offering for sale of CHANEL-branded handbags bearing counterfeit trademarks, as determined by the jury at trial. The Defendants shall also disgorge $12,739 in net profits from the sale of 51 CHANEL-branded handbags bearing voided Chanel Serial Numbers and 779 CHANEL-branded counter-support items, which the jury found were not authorized for sale by Chanel.

The Clerk is directed to enter judgment accordingly.

So ordered.

Dated: New York, New York
February 26, 2025

Louis L. Stanton
LOUIS L. STANTON
U.S.D.J.

ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 6/26/25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - -X
CHANEL, INC.,

Plaintiff,

- against -

18 Civ. 2253 (LLS)

OPINION & ORDER

WGACA, LLC; WHAT COMES AROUND GOES AROUND LLC d/b/a WHAT GOES AROUND COMES AROUND; MHW PROPERTIES, INC.; WGACA WEB, LLC; PINES VINTAGE, INC.; VINTAGE DESIGNS LTD.; and WCAGA LA, LLC,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - -X

This is a trademark infringement case between plaintiff Chanel, Inc., and defendants WGACA, LLC; What Comes Around Goes Around LLC d/b/a What Goes Around Comes Around; WGACA Web, LLC; and WCAGA LA, LLC (collectively, "WGACA"). This opinion resolves all remaining post-trial motions.

**BACKGROUND**

The Court assumes familiarity with the facts and procedural history of this case from its prior opinions.

From January 9, 2024, to February 6, 2024, this Court presided over a jury trial in which Chanel brought Lanham Act claims for trademark infringement, false association, unfair competition, and false advertising against WGACA. On February 6, 2024, the jury found WGACA liable on all claims and awarded

Chanel $4,000,000 in statutory damages pursuant to 15 U.S.C. § 1117(c)(2) (Dkt. No. 407). The Court held a bench trial on equitable remedies from July 15, 2024, to July 19, 2024, after which Chanel moved for entry of an injunction against WGACA and disgorgement of WGACA's profits (Dkt. No. 445). On February 26, 2025, the Court issued a permanent injunction and final judgment instructing Defendants to disgorge $12,739 in profits (Dkt. No. 505). On March 12, 2025, Chanel moved for attorneys' fees and costs (Dkt. No. 511). On March 26, 2025, WGACA moved for judgment as a matter of law and a new trial pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure (Dkt. No. 519) and requested that the Court enter findings of fact and conclusions of law in support of its disgorgement judgment (Dkt. No. 518).

## DISCUSSION

Before the Court are the parties' various post-trial motions. The Court addresses each motion in turn.

## I. ATTORNEYS' FEES

On March 12, 2025, Chanel moved for attorneys' fees and costs (Dkt. No. 511). For the reasons that follow, the Court awards costs but not attorneys' fees.

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing

party." 15 U.S.C. § 1117(a). Previously, a "finding of willfulness determine[d] the right to attorney's fees." Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849 (2d Cir. 1995), abrogated by 4 Pillar Dynasty LLC v. New York & Co., Inc., 933 F.3d 202 (2d Cir. 2019). However, the Second Circuit has since adopted the Supreme Court's definition of an exceptional case as "'one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.'. . . without tying the determination expressly to a finding of willfulness." 4 Pillar Dynasty LLC v. New York & Co., Inc., 933 F.3d 202, 215 (2d Cir. 2019) (quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014)). "Octane Fitness establishes no presumption — rebuttable or otherwise — that cases involving willful infringement are necessarily 'exceptional.'" Id. at 216.

District courts have "wide latitude" under this standard and are encouraged to engage in a "case-by-case exercise of their discretion, considering the totality of the circumstances." Id. at 215. "Courts may consider factors including frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of

compensation and deterrence." Id. (internal quotations and citations omitted). Since Octane Fitness, multiple judges in this District have denied requests for attorneys' fees in cases of willful infringement. See, e.g., Mattel, Inc. v. AnimeFun Store, 2024 WL 4635327, at *8 (S.D.N.Y. Oct. 30, 2024) (rejecting request for attorneys' fees despite willful infringement); Lexington Furniture Indus., Inc. v. Lexington Co., AB, 2023 WL 2707114, at *9-10 (S.D.N.Y. Mar. 30, 2023) (same); Esposito v. Info. Tech. Corp. of Tri-States, 2022 WL 17095252, at *3 (S.D.N.Y. Nov. 21, 2022) (same); Travel Leaders Grp., LLC v. Corley, 2019 WL 6647319, at *14 (S.D.N.Y. Dec. 5, 2019) (same), report and recommendation adopted, 2022 WL 950957 (S.D.N.Y. Mar. 30, 2022).

This is not an exceptional case. Trademark infringement is a familiar matter to every judge of this Court, and this dispute did not present particularly complex legal questions. The charge to the jury took just under an hour, and the verdict was received the next day at 2:15 p.m. Chanel lays great emphasis on two facts: that the jury made ten separate findings of willfulness against WGACA, and that the verdict was unanimous. But willfulness no longer determines awards of attorneys' fees in the Second Circuit, and the verdict form asked the question ten times. There was no novelty in the verdict being unanimous, as all verdicts in this Court are unanimous. F.R.C.P. 48.

While there was sufficient evidence at trial for the jury to find willful infringement, this was not a case of flagrant violations. As this Court has repeatedly pointed out, it is in WGACA's best interests to sell genuine CHANEL-branded goods. Though trial uncovered instances of willful infringement, those were a small percentage of WGACA's overall sales of CHANEL-branded items, which were mostly in the bounds of the Lanham Act. Chanel is right to point out that this case was not merely about isolated incidents of infringement, but also about WGACA's false association and false advertising, which the jury also found to be willful. However, these actions are better deterred by the existing injunction than by an award of attorneys' fees. An award of attorneys' fees will do no more to deter WGACA than the multimillion-dollar jury verdict already has.

Chanel also argues that WGACA acted in bad faith. However, both parties' actions reflected the normal tensions that arise over the course of more than six years of contentious litigation. Though they may have disagreed, both sides presented plausible legal arguments and defenses, and the case was not litigated in an objectively unreasonable way. Chanel is correct to point out WGACA's tendency to exaggerate and stretch the truth, but this occurred to some degree on both sides, and it was not so flagrant as to make this case "stand[] out from others." Octane Fitness, 572 U.S. at 554. Chanel's application

for attorneys' fees is denied.

Nonetheless, the Lanham Act allows prevailing plaintiffs to recover for "the costs of the action." 15 U.S.C. § 1117(a). Chanel requests the following costs: i) ESIH hosting costs of $197,910.44; ii) ESIH processing costs of $58,514.75; iii) Lexis fees of $13,556.70; and iv) Westlaw fees of $290,997.08, totaling $560,978.97. Max Decl. (Dkt. No. 512). Sheppard Mullin detailed each of these costs on its invoices to Chanel. Id. at Ex. 1. These are also the types of costs routinely awarded by courts. See, e.g., Carrington v. Graden, 2020 WL 5758916, at *17 (S.D.N.Y. Sept. 28, 2020) (awarding costs for "electronic discovery software and data hosting fees"); Ahava (USA), Inc. v. J.W.G., Ltd., 286 F. Supp. 2d 321, 325 (S.D.N.Y. 2003) (awarding "costs related to LEXIS charges"). These costs are therefore reasonable.

For the foregoing reasons, Chanel's motion for attorneys' fees is denied, and Chanel is awarded $560,978.97 in costs.

## II. FEDERAL RULES OF CIVIL PROCEDURE 50 AND 59

On March 26, 2025, WGACA moved for judgment as a matter of law and a new trial pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure (Dkt. No. 519). For the reasons that follow, WGACA's motion is denied.

Federal Rule of Civil Procedure 50 entitles a defendant to

judgment as a matter of law where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." F.R.C.P. 50(a)(1). Motions for judgment as a matter of law may be renewed after the entry of judgment and are governed by the same standard. F.R.C.P. 50(b). "[A] Rule 50 motion must be denied unless the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached." Cross v. New York City Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005) (internal quotations and citations omitted). "A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict." Id.

Federal Rule of Civil Procedure 59 states that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." F.R.C.P. 59(a)(1)(A). This includes where a verdict is against the weight of the evidence. Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 417 (2d Cir. 2012). "A grant of a new trial on the ground that the verdict was against the weight of the evidence is appropriate if the jury has

reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 634 (2d Cir. 2002) (internal quotations and citations omitted). The Court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." Raedle, 670 F.3d at 418. "However, our precedent counsels that trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." Id. (internal quotations and citations omitted). "Where the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." Id. (internal quotations and citations omitted).

WGACA requests that the Court grant judgment as a matter of law or a new trial on the issue of willful counterfeiting with respect to the 13 Corti bags and the brown pouch. WGACA's primary argument about the Corti bags is the same one its attorneys attempted to advance at trial, namely that "goods produced in a factory authorized by the mark holder to make the type of good at issue are not counterfeit, even if the mark

holder did not authorize the production of the specific goods." WGACA Br. at 4-5 (Dkt. No. 520). However, as Chanel points out, WGACA presented no evidence to support its proposition that the bags bearing voided Corti serial numbers were actually made in a Chanel factory. WGACA called zero witnesses at trial and did not elicit testimony proving this point on cross-examination. The only references to WGACA's unfounded theory were through statements from its attorneys, which are decidedly not evidence. Not surprisingly, WGACA's briefs cite to only three places in the record to support this argument, all of which were statements from attorneys. Trial Tr. (Dkt. No. 433 at 1740:3-9, 1742:23-1743:1; Dkt. No. 435 at 2039:6-17).

The testimony of Chanel's witnesses consistently and forcefully rebutted WGACA's assertions about the Corti bags. The jury heard weeks of testimony about the Orli system and the importance of Chanel Serial Numbers in determining whether a handbag is genuine or counterfeit. Id. (Dkt. No. 531 at 364:17-25, 365:7-16, 381:11-16; Dkt. No. 415 at 612:6-613:5; Dkt. No. 425 at 1312:4-5; Dkt. No. 419 at 766:18-767:1, 814:7-13; Dkt. No. 429 at 1479:23-1480:8; Dkt. No. 433 at 1779:16-1780:1, 1783:19-22). The jury also learned that Chanel Serial Numbers, stickers, and authenticity cards are only linked to handbags in the Orli system once they have gone through quality control procedures. Id. (Dkt. No. 531 at 335:1-11, 343:17-344:20, 364:7-

15; Dkt. No. 417 at 664:7-20; Dkt. No. 419 at 785:20-25, 806:4-807:1). Chanel's witnesses testified that no genuine Chanel handbags were ever authorized to be made with the stolen Chanel Serial Numbers, as they were voided after the theft, before they could be associated with any authorized handbags. Id. (Dkt. No. 415 at 615:2-617:13; Dkt. No. 417 at 672:4-14; Dkt. No. 427 at 1372:13-21, 1424:16-23; Dkt. No. 531 at 339:15-23, 340:17-342:2, 359:13-22); Trial Exs. 51, 90. Contrary to WGACA's assertions, there was no evidence presented that handbags, not authenticity cards, were stolen from the Corti factory. Trial Tr. (Dkt. No. 531 at 359:13-20); Trial Ex. 90. This is bolstered by the fact that the stolen authenticity cards were later found in counterfeiting raids. Trial Tr. (Dkt. No. 419 at 813:6-22); Trial Ex. 1261. It is also hard to believe that a theft of 30,000 handbags, which are much larger than authenticity cards, could go on unnoticed. See Trial Tr. (Dkt. No. 427 at 1450:23-1451:2; Dkt. No. 531 at 359:13-360:3) (noting small size of authenticity cards and quick nature of theft). In sum, WGACA's arguments about the Corti bags are mere speculation by its attorneys.

WGACA also argues that bags with genuine Chanel hardware, including Exhibit 1369, cannot be counterfeit, but Chanel clearly disproved this at trial. Chanel presented extensive witness testimony about how some counterfeit bags, including

"Frankenstein bags," can contain genuine hardware. Id. (Dkt. No. 413 at 481:18-23, 490:16-20, 493:20-494:3; Dkt. No. 419 at 849:11-16). Mr. Bravo also highlighted other nongenuine aspects of the bag independent from its hardware. Id. (Dkt. No. 425 at 1305:17-20, 1309:12-13, 1323:16-17) (including CC logo stitching, thread color, chain length, leather color). WGACA cherry-picks Mr. Bravo's testimony and lays great weight on his erroneous statements about the zipper pull, but he later corrected himself. Id. (Dkt. No. 425 at 1307:4-1308:11, 1325:1-17). The jury was aware of these inconsistencies and still found for Chanel. It is up to the jury, not the Court, to make credibility determinations. Raedle, 670 F.3d at 418.

The jury also heard sufficient evidence to conclude that the brown pouch, Exhibit 1374, was counterfeit. Chanel's witnesses testified that 10218184 is one of the most pirated Chanel Serial Numbers. Trial Tr. (Dkt. No. 419 at 895:20-896:1). Chanel also showed Orli records for the genuine 10218184 handbag, which was a different style of bag that was made in 2005. Id. (Dkt. No. 433 at 1805:24-1806:8); Trial Exs. 51, 1010B. WGACA argued that the pouch contained a genuine repair certificate from Chanel, making it authentic. But that repair occurred in 2004, before the authentic bag was sold, and Chanel found no repair record for a bag with the 10218184 serial number. Trial Tr. (Dkt. No. 419 at 810:19-811:6); Trial Exs.

123, 123A. WGACA explained this discrepancy by asserting that the serial number was likely a typo or database error, but WGACA failed to produce the actual serial number or call a witness to testify on the matter, instead reading in the deposition of Sun Li. Trial Tr. (Dkt. No. 433 at 1806:14-23). It was reasonable for the jury to conclude that the pouch was counterfeit in light of limited evidence to the contrary.

There was also sufficient evidence of WGACA's willfulness. WGACA contends that it could not possibly have known that any of the bags were counterfeit without access to the Orli system or information on the Corti theft. Though WGACA is correct that lack of access to the Orli system makes it more difficult to recognize counterfeits, Chanel's witnesses identified multiple instances where WGACA knew or should have known that certain items were nongenuine and moved forward with sales activity anyway. The jury heard about WGACA's sale of multiple handbags after Chanel notified WGACA that they bore voided serial numbers, including the 191 and 828 bags. Id. (Dkt. No. 415 at 615:2-9; Dkt. No. 417 at 672:4-14; Dkt. No. 423 at 1144:22-1146:5, 1219:2-4; Dkt. No. 435 at 2021:10-13); Trial Exs. 1010A-D, 1012-13, 1016, 1063, 1234. Additionally, the jury learned about gaps in WGACA's authentication and recordkeeping procedures. Trial Tr. (Dkt. No. 423 at 1094:7-22, 1095:9-13, 1096:4-1097:13). The jury also saw WGACA's seemingly nonchalant

response to Chanel's legal concerns, including WGACA CEO Seth Weisser saying that Chanel's cease and desist letter was "Very funny. So legal." Trial Ex. 1234. WGACA insisted throughout trial preparation that willfulness was not a consideration for the jury and, as a result, called no witnesses and presented a minimal defense on this issue. The jury's conclusion was reasonable in light of this evidence.

For the foregoing reasons, WGACA's motion for judgment as a matter of law and a new trial pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure is denied.

## III. STATUTORY DAMAGES

In the absence of judgment as a matter of law or a new trial on willful counterfeiting, WGACA requests that the Court lower the statutory damages award. The Court declines to do so.

15 U.S.C. § 1117(c) allows for statutory damages in counterfeiting cases of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold . . . [or] if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold." At trial, the jury found that WGACA engaged in willful counterfeiting and awarded Chanel $4 million dollars in statutory damages, representing $2 million for the CC logo and $2 million for the

Chanel name. WGACA urges the Court to lower the statutory damages award through remittitur or on due process grounds, arguing that it is excessive and not supported by the evidence.

"Jury verdicts should be disturbed with great infrequency," and "the calculation of damages is the province of the jury." Beastie Boys v. Monster Energy Co., 66 F. Supp. 3d 424, 436, 462 (S.D.N.Y. 2014) (internal quotations and citations omitted). "Because Congress specifically determined the appropriate statutory range for damages in trademark . . . actions, a court's review of such a reward is extraordinarily deferential," and "[i]n the specific context of statutory damages under the . . . Lanham Act, Congress has placed an upper bound on the damages that a jury can award, which mitigates the risk of a truly untethered award." John Wiley & Sons, Inc. v. Book Dog Books, LLC, 327 F. Supp. 3d 606, 635 (S.D.N.Y. 2018) (internal quotations and citations omitted).

The award here is within the range prescribed by Congress, and the jury took great care to ensure that was so. During deliberations, they specifically asked about the "willful infringement maximum," evincing a clear intent to award the maximum amount of damages allowed under the statute. Jury Note #4 (Dkt. No. 405); Trial Tr. (Dkt. No. 443 at 2264:12-19). "[T]he question is not what this Court would award were it deciding the question itself; the question is whether the jury's

award is so excessive that the Court should intrude on its prerogative to set damages." Agence France Presse v. Morel, 2014 WL 3963124, at *15 (S.D.N.Y. Aug. 13, 2014). The answer to that question is no.

**IV. DISGORGEMENT OF PROFITS**

On February 26, 2025, the Court awarded Chanel $12,739 in profits (Dkt. No. 505). WGACA sought findings of fact and conclusions on law in support of that judgment (Dkt. No. 518).

"The award of profits is justified by three rationales: (1) to deter a willful wrongdoer from doing so again; (2) to prevent the defendant's unjust enrichment; and (3) to compensate the plaintiff for harms caused by the infringement." Merck Eprova AG v. Gnosis S.p.A., 901 F. Supp. 2d 436, 457 (S.D.N.Y. 2012), aff'd, 760 F.3d 247 (2d Cir. 2014). Courts in the Second Circuit consider various equitable factors when deciding whether to grant a successful plaintiff an award of a defendant's profits under the Lanham Act, including: "(1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) any delay by plaintiff; and (5) plaintiff's clean (or unclean) hands." 4 Pillar Dynasty LLC v. New York & Co., Inc., 933 F.3d 202, 214 (2d Cir. 2019). An award is

typically for "net profits, but the infringer bears the burden to prove any deductions for its costs from the gross revenues attributable to its infringement." Id. at 214 n.11 (internal quotations and citations omitted). An infringer must demonstrate a "sufficient nexus between each expense claimed and the sales of the unlawful goods" and "propos[e] a fair and acceptable formula for allocating a portion of overhead expenses to the infringing items at issue." Hamil Am. Inc. v. GFI, 193 F.3d 92, 107 (2d Cir. 1999) (internal quotations and citations omitted).

The Court's award here was largely informed by the second equitable factor, the availability and adequacy of other remedies. In addition to the disgorgement award, the Court issued a permanent injunction limiting a range of WGACA's conduct with respect to CHANEL-branded products, including restrictions on product listings, disclaimers, hashtags, discount codes, photographs, props, and other safeguards on the advertisement, distribution, and sale of CHANEL-branded products. Injunctive relief is the most appropriate and effective remedy for Chanel's false association, unfair competition, and false advertising claims, particularly given the lack of tangible economic harm to Chanel.

Nonetheless, WGACA would be unjustly enriched if it were permitted to retain profits from the sale of specific infringing items. The $12,739 disgorgement figure represents net profits

from the sale of 51 CHANEL-branded handbags bearing voided Chanel Serial Numbers and 779 CHANEL-branded counter-support items, all of which the jury found were not authorized for sale by Chanel. This figure excludes WGACA's sales of other CHANEL-branded items, as their connection to the infringing conduct is more remote and difficult to quantify, making injunctive relief a more appropriate remedy. The Court accepts WGACA's cost deductions, as they have a sufficient nexus to the sale of the infringing products and a practical method of allocation.

**CONCLUSION**

For the foregoing reasons, the parties' post-trial motions are resolved in accordance with the rulings above.

So ordered.

Dated: New York, New York
June 26, 2025

Louis L. Stanton
LOUIS L. STANTON
U.S.D.J.

**15 U.S.C. § 1114. Remedies; infringement; innocent infringement by printers and publishers**

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

As used in this paragraph, the term "any person" includes the United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, or other persons acting for the United States and with the authorization and consent of the United States, and any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. The United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, other persons acting for the United States and with the authorization and consent of the United States, and any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

* * *

**15 U.S.C. § 1116. Injunctive relief.**

* * *

**(d) Civil actions arising out of use of counterfeit marks**

* * *

(1)(B) As used in this subsection the term "counterfeit mark" means—

(i) a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered; or

(ii) a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of this chapter are made available by reason of section 220506 of title 36;

but such term does not include any mark or designation used on or in connection with goods or services of which the manufacture1 or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.

* * *

**15 U.S.C. § 1117. Recovery for violation of rights**

**(a) Profits; damages and costs; attorney fees**. When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

* * *

**(c) Statutory damages for use of counterfeit marks.** In a case involving the use of a counterfeit mark (as defined in section 1116(d) of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a), an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of—

(1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

(2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

* * *

**15 U.S.C. § 1127. Construction and definitions; intent of chapter.**

* * *

A "counterfeit" is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.

* * *

## CERTIFICATE OF SERVICE

I, Amy Mason Saharia, counsel for appellant and a member of the Bar of this Court, certify that, on October 22, 2025, a copy of the attached Special Appendix was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

OCTOBER 22, 2025

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA