# 25-722

## In the United States Court of Appeals for the Second Circuit

CHANEL, INC.,
PLAINTIFF-APPELLEE

*v.*

WHAT COMES AROUND GOES AROUND LLC, DBA WHAT GOES AROUND COMES AROUND, MHW PROPERTIES, INC., PINES VINTAGE, INC., VINTAGE DESIGNS LTD., WGACA, LLC, WGACA WEB, LLC, WCAGA LA, LLC,
DEFENDANTS-APPELLANTS,

SETH WEISSER, GERARD MAIONE, WGACA WEB, LLC,
DEFENDANTS.

*On Appeal from the United States District Court for the Southern District of New York, No. 1:18-cv-2253 (The Hon. Louis L. Stanton)*

**REPLY BRIEF OF APPELLANTS**

PETER T. SHAPIRO
LEWIS BRISBOIS BISGAARD & SMITH LLP
*7 World Trade Center*
*250 Greenwich Street, 11th Fl.*
*New York, New York 10007*
*(212) 232-1300*

LISA S. BLATT
AMY MASON SAHARIA
ALEXANDER HELDMAN
DANA GOTFRYD
CLAIRE GRODEN
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, SW*
*Washington, DC 20024*
*(202) 434-5000*
*asaharia@wc.com*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................ 1

ARGUMENT ........................................................................ 3

I. THE ERRONEOUS COUNTERFEIT INSTRUCTION NECESSITATES VACATUR. ........................................................................ 3

A. The Counterfeiting Instruction Failed To Instruct the Jury on the Law. ........................................................................ 3

B. WGACA's Proposed Instruction Was Correct. ........................................ 5

C. The Record Disproves Chanel's Forfeiture Argument. ................ 13

D. The Erroneous Instruction Was Not Harmless. ............................ 15

II. THE COURT'S EXCLUSION OF EVIDENCE OF CHANEL'S WITNESSES' BIAS REQUIRES A NEW TRIAL. ...... 17

A. The Excluded Evidence of Chanel Witnesses' Bias Was Necessary To Undermine Their Misleading Testimony. ............. 18

B. The Exclusion Prejudiced WGACA. ................................................ 23

III. THE STATUTORY DAMAGES AWARD VIOLATES THE DUE PROCESS CLAUSE. ........................................................................ 26

A. The Seventh Amendment Does Not Insulate the Damages Award from Appellate Scrutiny. ................................................ 26

B. The Award Violates the *Williams* Standard. ................................ 27

C. The Award Violates the *Gore* Standard. ........................................ 33

IV. THE DISTRICT COURT ERRED IN AWARDING UNRECOVERABLE "COSTS." ................................................ 34

CONCLUSION ........................................................................ 35

## TABLE OF AUTHORITIES

Page

### CASES

*4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202 (2d Cir. 2019) ....................8
*AL Infinity LLC v. Spalter*, 2025 WL 1937263 (2d Cir. July 15, 2025).....11, 12
*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996).......................33, 34
*Brainstorm Interactive, Inc. v. School Specialty, Inc.*,
2014 WL 6893881 (W.D. Wis. Dec. 5, 2014) ...............................................12
*Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899 (8th Cir. 2012).....30, 33
*Carroll v. Trump*, 124 F.4th 140 (2d Cir. 2024),
*petition for cert. filed*, No. 25-573 (Nov. 10, 2025) .......................................24
*Carvel Corp. v. Diversified Mgmt. Grp.*, 930 F.2d 228 (2d Cir. 1991) ............15
*Cary Oil Co. v. MG Refining & Mktg., Inc.*,
257 F. Supp. 2d 768 (S.D.N.Y. 2003)..........................................................19
*Chanel, Inc. v. The RealReal, Inc.*,
No. 1:18-cv-10626 (S.D.N.Y. filed Nov. 14, 2018) .........................................21
*Cobb v. Pozzi*, 363 F.3d 89 (2d Cir. 2004) ........................................................15
*Cunningham v. Cornell Univ.*, 604 U.S. 693 (2025) ...........................................7
*FTC v. Morton Salt Co.*, 334 U.S. 37 (1948)........................................................7
*Gessele v. Jack in the Box Inc.*, 160 F.4th 1011 (9th Cir. 2025).................28, 29
*Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111 (2d Cir. 2000) ............................15
*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
315 F. Supp. 2d 511 (S.D.N.Y. 2004)..........................................................29
*Harris v. O'Hare*, 770 F.3d 224 (2d Cir. 2014) ..................................................16
*In re Napster, Inc. Copyright Litig.*,
2005 WL 1287611 (N.D. Cal. June 1, 2005)...................................................34
*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*,
823 F.3d 153 (2d Cir. 2016) ..........................................................................6
*Johnson v. King-Richardson Co.*, 36 F.2d 675 (1st Cir. 1930) .........................18
*Knature Co. v. Duc Heung Grp., Inc.*,
2021 WL 3913194 (C.D. Cal. July 2, 2021) ...................................................12
*Lee v. Kucker & Bruh, LLP*, 2013 WL 680929 (S.D.N.Y. Feb. 25, 2013)........18
*Lobato v. Gomez*, 2017 WL 931824 (E.D. Cal. Mar. 8, 2017) ...........................19
*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
676 F.3d 83 (2d Cir. 2012) ............................................................................29
*Manbro Energy Corp. v. Chatterjee Advisors*,
2023 WL 2563054 (S.D.N.Y. Mar. 17, 2023).............................................19, 20

Page

Cases—continued:

*Medina v. Planned Parenthood*, 606 U.S. 357 (2025) ........................................6
*Monte Carlo Shirt, Inc. v. Daewoo Int'l (Am.) Corp.*,
707 F.2d 1054 (9th Cir. 1983)...................................................................9
*Nike, Inc. v. Top Brand Co.*, 2006 WL 2946472 (S.D.N.Y. Feb. 27, 2006)......32
*Palin v. New York Times Co.*, 113 F.4th 245 (2d Cir. 2024).............................19
*Parker v. Time Warner Ent. Co.*, 331 F.3d 13 (2d Cir. 2003)...........................34
*Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120 (2d Cir. 2014)..................27
*Rehaif v. United States*, 588 U.S. 225 (2019).................................................8
*RSD Leasing, Inc. v. Navistar Int'l Corp.*, 81 F.4th 153 (2d Cir. 2023) ...........9
*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005) ..................................5, 12
*Sony BMG Music Enter. v. Tenenbaum*, 719 F.3d 67 (1st Cir. 2013) ......26, 33
*St. Louis, Iron Mountain & S. Ry. Co. v. Williams*,
251 U.S. 63 (1919)...................................................................26, 27, 28
*Top Tobacco, L.P. v. Star Imps. & Wholesalers, Inc.*,
135 F.4th 1344 (11th Cir. 2025) ...........................................................29, 30
*Tri-M Grp. v. Sharp*, 2009 WL 3046382 (D. Del. Sept. 23, 2009).....................19
*Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014) ........................27
*United States v. Abel*, 469 U.S. 45 (1984)...........................................2, 18, 22, 24
*United States v. Memorial Sloan-Kettering Cancer Ctr.*,
563 F.3d 19 (2d Cir. 2009) .......................................................................5
*Wakefield v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022).................................28
*Woods v. START Treatment & Recovery Ctrs.*,
864 F.3d 158 (2d Cir. 2017) .....................................................................15

## CONSTITUTION, STATUTES, AND RULE

U.S. Const. amend. VII.....................................................................................26
15 U.S.C.
§ 1115.........................................................................................................6
§ 1115 (1982) ..............................................................................................6
§ 1116...................................................................................................*passim*
§ 1117...............................................................................................8, 9, 16
18 U.S.C. § 922 ..................................................................................................8
29 U.S.C. § 1106 ................................................................................................7

Page

Rule—continued:

Fed. R. Civ. P. 8 ........................................................................................7

**OTHER AUTHORITIES**

H.R. Rep. No. 98-997 (1984) ........................................................................9, 10

Joint Statement on Trademark Counterfeiting Legislation,
130 Cong. Rec. 31673 (1984) ........................................................................9, 10

3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:15 (5th ed. 2025) ........................................................14

S. Rep. No. 104-177 (1995) ........................................................................28

## INTRODUCTION

This is far from a typical counterfeiting case. WGACA is not a fly-by-night operation peddling knockoffs. WGACA's business model hinges on the authenticity of every vintage product it sells. The jury's finding that WGACA willfully sold counterfeit bags rested on the thinnest of evidence that was distorted by a crucial instructional error and erroneous evidentiary rulings. The verdict, along with the astronomical $4 million statutory damages award, should not stand.

Critically, Chanel concedes that handbags made by an authorized Chanel factory cannot bear counterfeit marks. But the district court did not instruct the jury about this aspect of the statutory counterfeit definition, and Chanel conspicuously does not defend the court's reasoning as to why it removed this part of the draft instruction during the charge conference.

Chanel instead offers two Hail Mary's. First, with no support in the Lanham Act's text or structure, or in precedent, Chanel contends that WGACA was not entitled to the instruction because *WGACA* bore the burden to prove the origin of every vintage Chanel-branded handbag it sold. That interpretation of the Act, plucked from one sentence in ambiguous legislative history, is wrong and would devastate the future of resale industries. Second,

Chanel claims that WGACA forfeited its request for this instruction. But WGACA repeatedly requested the instruction at the charge conference, and Chanel's claim that WGACA disavowed the "overrun exclusion" rests on a statement by *Chanel's* counsel. The charge conference transcript demolishes Chanel's forfeiture claim.

As to the district court's exclusion of evidence of Chanel's witnesses' bias against the secondhand market, Chanel claims the excluded evidence related only to its motivation for suing. But "there is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible." *United States v. Abel*, 469 U.S. 45, 56 (1984). Evidence that Chanel planned to "tackle" the "threat[]" of the secondhand market through "legal action," J.A.903, 922, would have discredited specific, misleading statements by Chanel's witnesses. That WGACA did its best to show their bias with one hand tied behind its back came nowhere close to curing the prejudice.

These cumulative errors produced a $4 million statutory damages award that violates the Due Process Clause. As for the erroneous costs award, even Chanel agrees it must be vacated.

## ARGUMENT

### I. THE ERRONEOUS COUNTERFEIT INSTRUCTION NECESSITATES VACATUR.

The Lanham Act is clear: if the thirteen allegedly counterfeit bags bearing authentic serial numbers that Chanel assigned to the Corti factory were made by that factory, they do not bear "counterfeit mark[s]." 15 U.S.C. § 1116(d)(1)(B). Chanel does not dispute this point. Chanel's arguments that the district court implicitly instructed the jury on this legal rule, that WGACA's proposed instruction incorrectly put the burden on Chanel, and that WGACA forfeited this critical instruction are flatly wrong.

#### A. The Counterfeiting Instruction Failed To Instruct the Jury on the Law.

The district court never instructed the jury that a "counterfeit mark … does not include any mark" used on goods manufactured by a factory "authorized to use the mark … for the type of goods or services so manufactured." 15 U.S.C. § 1116(d)(1)(B). Instead, the court instructed the jury that: (1) a counterfeit is "a mark that is not genuine or authentic but is substantially indistinguishable from a registered trademark," (2) a counterfeit handbag is "so close a copy that it is difficult to tell it from the original," and (3) "[d]eviations between genuine Chanel products and the contested goods, including discrepancies between Chanel records and the actual characteristics of the

contested goods, may be evidence that they were not manufactured by Chanel." J.A.3988.

Chanel (at 21-22) does not defend the court's suggestion during the charge conference that the word "copy" in sentence (2) above covered the Section 1116(d)(1)(B) definition. J.A.3955. Nor could it. *See* WGACA Br. 30-31. Chanel does not contest that the Act treats copies and counterfeits as distinct, and that "copies" may infringe but not qualify as counterfeits. WGACA Br. 31.

Instead, Chanel (at 22) argues that sentence (3) above provided the "key language" embracing the Section 1116(d)(1)(B) definition. To the contrary, that sentence affirmatively undermines the definition. That sentence suggested that a handbag "not manufactured by Chanel" is counterfeit—implying that even handbags manufactured by authorized third parties like Corti *are* counterfeits. Worse still, the instruction focused the jury on "discrepancies between Chanel records" and the handbags. J.A.3988. That sentence misdirected the jury's attention away from the bags' *origin*—the key to the statutory definition—and instead to how the bags' serial numbers were recorded in Chanel's error-prone ORLI system. *See* WGACA Br. 10-11 (outlining

errors in ORLI and Corti factory's access to ORLI).[1] If the Corti factory manufactured bags with the "stolen" but authentic serial numbers, Chanel's database would not identify the manufacture. But the bags would not be counterfeits.

### B. WGACA's Proposed Instruction Was Correct.

Chanel contends that WGACA's proposed instruction—that Chanel "has the burden of proving by a preponderance of evidence" that the allegedly counterfeit handbags "were not in fact made in a factory authorized by Chanel to make Chanel handbags"—was incorrect. J.A.1068. Chanel (at 23-25) largely relies on cherrypicked lines from legislative history to argue that Section 1116(d)(1)(B) sets out an affirmative defense, but courts do "not resort to legislative history to cloud a statutory text that is clear." *United States v. Memorial Sloan-Kettering Cancer Ctr.*, 563 F.3d 19, 27-28 (2d Cir. 2009) (citation omitted). No authority supports Chanel's affirmative-defense argument.

1. The "ordinary default rule" in allocating the burden of proof is that "plaintiffs bear the risk of failing to prove their claims." *Schaffer ex rel.*

[1] When Chanel voids a serial number in ORLI, it does not always determine or log the cause. J.A.3741, 3746, 3798. Chanel (at 12) complains that WGACA proved this fact in relation to a different set of allegedly infringing handbags, but Chanel uses the same ORLI system for all handbags.

*Schaffer v. Weast*, 546 U.S. 49, 56 (2005). Nothing in Section 1116(d)(1)(B)'s text suggests that Congress intended to rebut that default premise. "Congress knows how" to denote an affirmative defense. *See Medina v. Planned Parenthood*, 606 U.S. 357, 378 (2025). When Congress enacted Section 1116(d)(1)(B) in 1984, it already had created affirmative defenses elsewhere in the Act. Section 1115(a) provides that, although a mark's registration establishes prima facie evidence of incontestability, that registration "does not preclude another person from *proving* any legal or equitable defense or defect" set out in the following subsection, entitled "Incontestability; defenses." 15 U.S.C. § 1115(a) (emphasis added); *see* 15 U.S.C. § 1115(a) (1982) (materially same). That provision—unlike Section 1116(d)(1)(B)—explicitly places the burden of "proving" "defenses" on defendants, and courts accordingly have interpreted it as an affirmative defense. *See, e.g.*, *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 167 (2d Cir. 2016). Congress' decision to eschew similar language in Section 1116(d)(1)(B) undercuts any notion that it intended to create an affirmative defense.

Chanel (at 23) claims that "placement of the word 'but'" in the definition sets off the at-issue language as an affirmative defense. But it cites no case supporting that stunning assertion. Chanel's rule would set traps across the

U.S. Code primed on the hair trigger of a common conjunction that would shift the default burden-of-proof rule and threaten forfeiture at the pleading stage. *See* Fed. R. Civ. P. 8(c). Chanel's failure to cite even a single case supporting its "but" theory is telling.

2. Structural clues in the Lanham Act underscore that the authorized-factory aspect of the statutory definition is not an affirmative defense.

*First*, the location of the at-issue language in a definitional provision, rather than as a "special exception to the prohibitions of a statute," *FTC v. Morton Salt Co.*, 334 U.S. 37, 44 (1948), is probative. The "orthodox format of an affirmative defense" involves an exemption "laid out apart from the prohibitions," and "expressly refe[rs] to the prohibited conduct as such" in that exemption. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 701-02 (2025) (citation omitted); *see, e.g.*, 29 U.S.C. § 1106(a) (setting out prohibitions "[e]xcept as provided in section 1108 of this title").

In contrast, Congress chose to place the authorized-factory language in a provision defining what is a counterfeit in the first place. Had it followed the "orthodox format of an affirmative defense," *Cunningham*, 604 U.S. at 702, it would have carved out selling goods manufactured in an authorized factory

from the prohibited *conduct*. Chanel cites no case holding that Congress buried an affirmative defense in a definitional provision.

*Second*, Chanel's interpretation would render the statutory damages provision in Section 1117(c) incomprehensible. Congress nested the Section 1116(d)(1)(B) definition *inside* Section 1117(c). The Act imposes severe statutory damages when "use of a counterfeit mark (as defined in section 1116(d) of [Title 15]) … is willful." 15 U.S.C. § 1117(c). A defendant "use[s]" a "counterfeit mark" with "willful" intent when it knows or recklessly disregards that the mark is counterfeit. *See 4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202, 209-10 (2d Cir. 2019).

A defendant can know or disregard that a mark is counterfeit only if it knows or disregards that the mark bears the statutorily required characteristics of a "counterfeit mark (as defined in section 1116(d))," 15 U.S.C. § 1117(c)—including that the at-issue good was not manufactured in an authorized factory. *See Rehaif v. United States*, 588 U.S. 225, 229-31 (2019) (interpreting "knowingly violates [18 U.S.C. § 922(g)]" to require proof of knowledge as to every material element in Section 922(g)). Yet on Chanel's view, WGACA bore the burden to prove the items were not counterfeit even while Chanel bore the burden to prove that WGACA *willfully* sold counterfeit

items. J.A.3988. Chanel never explains how its affirmative-defense reading of Section 1116(d)(1)(B) meshes with Section 1117(c).

3. Chanel's resort (at 23-25) to "snippets of legislative history" does not overcome the statute's unambiguous text and structure. *See RSD Leasing, Inc. v. Navistar Int'l Corp.*, 81 F.4th 153, 166 n.19 (2d Cir. 2023). Regardless, the legislative history is mixed, evincing Congress' understanding that Section 1116(d)(1)(B) merely confirms that goods manufactured by authorized factories are not "counterfeit."

Congress enacted Section 1116(d)(1)(B) in the Trademark Counterfeiting Act of 1984, which created "enhanced penalties only for certain types of egregious [counterfeiting] prohibited by existing law." Joint Statement on Trademark Counterfeiting Legislation ("Joint Statement"), 130 Cong. Rec. 31673 (1984). The House Judiciary Committee expressed its view that the increased counterfeiting sanctions "must be limited to only the most egregious conduct." H.R. Rep. No. 98-997, at 6 (1984).

Importantly, the Committee noted that the Ninth Circuit *already* had held that the sale of goods made by an authorized factory but not authorized for sale by the trademark owner is "not even trademark infringement under the Lanham Act." *Id.* at 7 (citing *Monte Carlo Shirt, Inc. v. Daewoo Int'l*

*(Am.) Corp.*, 707 F.2d 1054 (9th Cir. 1983)). The report clarified that the Committee

> t[ook] no position on whether certain activities are violations of current civil law, but excludes such activities from the scope of this legislation. Excluded, for example, are practices involving so-called 'overruns' and 'parallel imports' or 'grey market' goods.

H.R. Rep. No. 98-997, at 7; *see also id.* at 13; Joint Statement, 130 Cong. Rec. at 31673 ("Unless it does so explicitly, this act does not in any way modify the Lanham Act or judicial interpretations of it.").

In other words, in enacting Section 1116(d)(1)(B), Congress sought to clarify that marks on goods manufactured in authorized factories are not "counterfeit"—without taking a position as to whether such goods were counterfeits before the at-issue amendment. It would be passing strange to transform that provision designed to protect defendants from the Act's harsh penalties into defendants' affirmative burden.

4. Courts regularly treat the full "counterfeit mark" definition in Section 1116(d)(1)(B) as an element on which plaintiffs bear the burden of proof. *See* WGACA Br. 27-28 (citing cases). Chanel identifies *no* case where any court has instructed that the defendant bears the burden of proving a mark does not meet Section 1116(d)(1)(B)'s definition of "counterfeit mark."

Instead, Chanel (at 26, 31-32) misleadingly quotes from an unpublished summary order of this Court discussing parties' burdens of *production* at summary judgment. In *AL Infinity LLC v. Spalter*, 2025 WL 1937263 (2d Cir. July 15, 2025) (summary order), the plaintiff alleged that the defendants sold counterfeit speakers; the defendants claimed the speakers had been manufactured in an authorized factory and thus were not counterfeit. *Id.* at *1-2. The district court granted summary judgment to the defendants and denied summary judgment to the plaintiff, but this Court concluded that the plaintiff had offered "sufficient evidence to support an inference" that the goods were not manufactured in an authorized factory and therefore had "establish[ed] a *prima facie* case." *Id.* at *3-4.

Chanel (at 26) quotes this Court's statement that "[t]o the extent that [defendant's] theory is that the speakers were manufactured . . . pursuant to authorization . . . [defendant] must proffer evidence to support that contention," but that statement merely referenced the defendant's summary-judgment burden. *Id.* at *4 (remanding to give defendant opportunity to "marshal the necessary evidence to defeat AL Infinity's summary judgment motion"). The Court did not expressly discuss the burden of proof, but if anything, the decision confirms that plaintiffs bear the burden to prove that the

goods were not manufactured in an authorized factory—which the Court described as part of the plaintiff's "*prima facie* case." *Id.* at *4.

Other cases cited in WGACA's opening brief, although silent as to the burden or featuring undisputed evidence demonstrating manufacture in an authorized factory, are consistent with requiring plaintiffs to prove that marks satisfy the full definition of "counterfeit mark." *See, e.g.*, *Brainstorm Interactive, Inc. v. School Specialty, Inc.*, 2014 WL 6893881, at *16 (W.D. Wis. Dec. 5, 2014) (granting defendant summary judgment where facts "undisputed"); *Knature Co. v. Duc Heung Grp., Inc.*, 2021 WL 3913194, at *3-5 (C.D. Cal. July 2, 2021) (criticizing the *plaintiff* for offering a "counterfeit theory … based on nothing more than speculation and conjecture" when evidence demonstrated that at-issue product was made in authorized factory).

5. Finally, Chanel's assertion that defendants must prove manufacture in authorized factories does not align with discrepancies in parties' access to that information. The "ordinary" allocation of the burden of proof, "based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary." *Schaffer*, 546 U.S. at 60 (citation omitted). Mark holders maintain confidential information

about the nature and conduct of their authorized factories; secondhand sellers like WGACA do not.

### C. The Record Disproves Chanel's Forfeiture Argument.

Chanel (at 27-29) next argues that WGACA "waived its claim of error" as to the counterfeiting instruction. But WGACA not only proposed a correct instruction, J.A.1068; it vigorously opposed the court's decision to remove the at-issue language, J.A.3954-55.

When Chanel urged removal of this instruction at the charge conference, WGACA strenuously objected, arguing that "[t]hose items were absolutely made in a [Chanel-authorized] factory … they were made in a factory and it's Chanel's burden to establish that they were counterfeit." J.A.3954-55. In response to the court's offer to remove the relevant language, WGACA's counsel said, "No. That's part of your definition, your Honor, that if it's made in a[n authorized] factory," it is not counterfeit, and added that "the definition that we've been operating under is that those bags were made in their factory." J.A.3955.

Chanel's claim (at 27-28) that WGACA forfeited the instruction rests on a sleight of hand. Although WGACA's counsel repeatedly requested an instruction that goods made in authorized factories are not counterfeit, he

observed that WGACA was not invoking an "overrun" theory, *i.e.*, that the Corti factory produced handbags in excess of the numbers authorized. J.A.3946, 3954. Chanel (at 28) claims that by stating "this is not an overrun case," J.A.3954, WGACA disclaimed entirely the applicability of the authorized-factory definition. Not so. Section 1116(d)(1)(B), which does not even use the word "overrun," is not limited to overruns; it defines counterfeits as not including *any* goods made by an authorized factory—language that also includes, to give two examples, parallel imports and gray goods. *See* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:15 (5th ed. 2025). The definition also includes goods with authentic serial numbers stolen from authorized factories or surreptitiously produced by authorized factories. WGACA's trial counsel immediately followed his statements that "this is not an overrun case," J.A.3946, by reiterating that the allegedly counterfeit handbags "were made in Corti's factory," J.A.3946, and "were absolutely made in a[n authorized] factory," J.A.3954.

Chanel (at 28) claims that "WGACA reiterated that WGACA was not relying on the 'overrun exclusion'" (quoting J.A.3954-55). That is blatantly incorrect. Chanel's citation points to *its own counsel's* statement regarding the so-called "overrun exclusion"—not WGACA's counsel. J.A.3954. WGACA's

counsel never uttered those words. WGACA's counsel insisted throughout the charge conference that the handbags were not counterfeits because they were made in the Corti factory and that WGACA was entitled to an instruction explaining that concept to the jury.

### D. The Erroneous Instruction Was Not Harmless.

"An error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Cobb v. Pozzi*, 363 F.3d 89, 116 (2d Cir. 2004) (quotations omitted); *see also Woods v. START Treatment & Recovery Ctrs.*, 864 F.3d 158, 169 (2d Cir. 2017). And when "an instruction improperly directs the jury on whether the plaintiff has satisfied [its] burden of proof, 'it is not harmless error because it goes directly to the plaintiff's claim, and a new trial is warranted.'" *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (citation omitted).

The omission of an accurate definition of a counterfeit mark deprived the jury of the "legal context in which to assess the significance" of WGACA's arguments, including its insistence that the allegedly counterfeit bags were made in the Corti factory and its demonstration that at least one such bag was identical to a genuine Corti bag. *Carvel Corp. v. Diversified Mgmt. Grp.*, 930 F.2d 228, 231 (2d Cir. 1991). And, critically, the jury could not have coherently

determined whether WGACA acted willfully—*i.e.*, with the requisite scienter as to "counterfeit mark[s]," 15 U.S.C. § 1117(c)—without an accurate instruction. Chanel offers no response to this point.

Chanel contends that WGACA was not entitled to the instruction because the evidence did not prove the Corti factory made the handbags. But to receive a correct jury instruction, WGACA needed to show only that "there [was] some evidence supporting the theory behind the instruction so that a question of fact may be presented to the jury." *Harris v. O'Hare*, 770 F.3d 224, 238 n.9 (2d Cir. 2014) (citation omitted). Chanel witnesses confirmed that only Chanel-authorized factories had access to genuine hardware. J.A.3603, 3540, 3737. And Chanel's Joseph Bravo testified that one of the allegedly counterfeit handbags (Exhibit 1369) contained genuine Chanel hardware and was indistinguishable from a genuine Chanel bag (Exhibit 200), J.A.3749-50—evidence supporting an inference that both were made in the same authorized factory.

Chanel (at 11) contends that "Bravo highlighted other critical discrepancies" between Exhibits 1369 and 200. But he did so only *after* learning that Exhibit 200 was genuine and recanting his prior testimony to the contrary, and he admitted that his "memory" during his prior testimony "was not very

good." J.A.3752-53. Before, when Bravo incorrectly believed Exhibit 200 was non-genuine, he offered only one difference, noting that Exhibit 1369 had a shorter strap. J.A.3748-49. At best for Chanel, the evidence was in conflict. The jury lacked the necessary instruction to understand and weigh this conflicting evidence.

Critically, the evidence, including Bravo's testimony and the physical Exhibits 200 and 1369 that have been lodged with the Court, shows that WGACA reasonably could have believed the handbags bearing authentic serial numbers assigned to the Corti factory were in fact made at the Corti factory and thus did not willfully sell counterfeits. The lack of a correct instruction eviscerated WGACA's willfulness defense.

## II. THE COURT'S EXCLUSION OF EVIDENCE OF CHANEL'S WITNESSES' BIAS REQUIRES A NEW TRIAL.

Chanel does not dispute that evidence probative of a witness' bias is admissible. At trial, its witnesses repeatedly misled the jury about Chanel's approach to the secondhand market. Yet the district court precluded WGACA from undermining their credibility by demonstrating that Chanel considered secondhand sellers like WGACA a "[t]hreat to [Chanel's] business model." J.A.971. On appeal, Chanel woodenly characterizes that evidence as relating

only to Chanel's motivation to sue, but the evidence also proved Chanel's witnesses' bias. Exclusion of that evidence requires a new trial.

### A. The Excluded Evidence of Chanel Witnesses' Bias Was Necessary To Undermine Their Misleading Testimony.

1. Chanel's primary argument (at 36-41) is that the excluded evidence was "not evidence that any particular witness harbored bias," but rather "relates only to *motivation* for bringing suit." But WGACA argued before trial that evidence of Chanel's anti-secondhand-market strategy was relevant *both* to show Chanel's motivation to sue and for the jury to evaluate "the credibility of [Chanel's] witnesses." J.A.884. And "there is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible; quite the contrary is the case." *Abel*, 469 U.S. at 56. By granting Chanel's motion in limine to exclude such evidence in toto, SP.A.2, the court precluded WGACA from using it for *either* purpose.

Chanel (at 38-41) fills pages with precedent holding that plaintiffs are entitled to prevail on the merits regardless of their motives, *e.g.*, *Johnson v. King-Richardson Co.*, 36 F.2d 675, 677 (1st Cir. 1930), and that defendants are not generally entitled to discover evidence of plaintiffs' motives for suing, *e.g.*, *Lee v. Kucker & Bruh, LLP*, 2013 WL 680929, at *2 (S.D.N.Y. Feb. 25, 2013);

*Tri-M Grp. v. Sharp*, 2009 WL 3046382, at *1 (D. Del. Sept. 23, 2009). Those cases are irrelevant here, because those defendants lacked any proper purpose (such as bias) for which the evidence could be used.

Chanel's attempts (at 40-41) to distinguish *Palin v. New York Times Co.*, 113 F.4th 245 (2d Cir. 2024), and *Lobato v. Gomez*, 2017 WL 931824 (E.D. Cal. Mar. 8, 2017), are unconvincing. Chanel (at 40) argues that neither case "concern[ed] exclusion of evidence of a plaintiff's motivation for bringing suit," but there is nothing particularly sacred about that type of evidence. To be sure, evidence of a plaintiff's motivation tends not to be probative, standing alone, of the merits of a claim. *Cary Oil Co. v. MG Refining & Mktg., Inc.*, 257 F. Supp. 2d 768, 773 (S.D.N.Y. 2003), which Chanel (at 38) repeatedly cites, illustrates that point: there, the district court excluded evidence of the plaintiffs' motivations for filing suit because of its minimal probative value to the plaintiffs' contract claim and the risk of jury distraction. The court did not consider an argument that the evidence bore on witnesses' bias.

Tellingly, even Chanel (at 38, 40) agrees that *Manbro Energy Corp. v. Chatterjee Advisors*, 2023 WL 2563054 (S.D.N.Y. Mar. 17, 2023), is persuasive precedent. There, the district court found that evidence of a plaintiff's motives for bringing a lawsuit is "irrelevant to the merits of its claims"—but only after

concluding that such evidence did not "tend[] to undermine the credibility of a key witness." *Id.* at *5. Here, by contrast, evidence of Chanel's hostility to the secondhand market was a crucial means of undermining the credibility of three of Chanel's key witnesses.

2. The record belies Chanel's claims (at 41-48) that its key witnesses' testimony was neither misleading nor undermined by the excluded evidence of Chanel's anti-secondhand strategy.

*Joyce Green*. Chanel's first witness—its managing director for France and former general manager for U.S. fashion—repeatedly offered misleading testimony about Chanel's approach to the secondhand market. At one point, Green claimed WGACA was "found to sell counterfeits," J.A.3448—a statement the court found constituted "open and flagrant contempt" of its pretrial order. J.A.3449, 3451. Soon after, Green flat-out denied that Chanel took issue with secondhand sales of Chanel handbags. J.A.3454. But Green herself knew that testimony was false, because she received at least one of the excluded presentations that documented Chanel's "Second Hand Project." J.A.897. That presentation explained that the secondhand market posed a "[r]isk of cannibalization threatening [Chanel's] business model." J.A.899.

Similarly, Green's description of her own, seemingly benign reasons for "protect[ing] the brand" via enforcement actions, J.A.3427, obscured Chanel's ulterior motive of neutralizing what Chanel viewed as the serious threat of the secondhand market. One slide from an internal Chanel presentation is particularly telling. Titled "Brand Protection is a Challenge Today," the slide identifies a variety of "Threats," *separately* listing "Counterfeit," "Trademark Violations," and "Second Hand." J.A.922. All of those challenges, the slide instructs, are to be dealt with through "[p]ossible legal action." J.A.922. Chanel's claim (at 42) that Green "did not 'testify about her *motivations*'" contradicts the record: Green stated that "I would say myself and most employees with Chanel have a strong desire to protect the brand." J.A.3427.

Chanel (at 43) claims that WGACA takes the 2017 presentations "out-of-context" because Chanel was "considering business options concerning the second hand market," including partnership. But Chanel's internal documents show that it treated the secondhand market as a significant threat. Regardless of what options it contemplated in 2017, Chanel's ultimate decision is clear. In 2018, it filed suit against both WGACA and The RealReal. *See Chanel, Inc. v. The RealReal, Inc.*, No. 1:18-cv-10626 (S.D.N.Y. filed Nov. 14, 2018).

*Jennifer Bleys*. Chanel's argument (at 45) that the testimony of Jennifer Bleys, an eight-year Chanel veteran, was "entirely consistent with record evidence" illustrates the problem with the district court's ruling: WGACA was precluded from admitting contrary evidence. For example, during questioning about the cease-and-desist letter Chanel sent WGACA in 2015, Chanel's counsel asked Bleys if Chanel had similar interactions with other secondhand sellers and if Chanel ultimately sued them. J.A.3793-94. Bleys responded that "[i]f they cooperate, we wouldn't have brought a lawsuit." J.A.3794. Yet the court improperly rejected WGACA's argument that Bleys' testimony "opened the door" to evidence of Chanel's anti-secondhand strategy that would have impeached Bleys. J.A.3798.

Here, too, evidence that Chanel treated "[p]ossible legal action" as the solution to the *business* threat posed by the secondhand market bears on Bleys' credibility. The jurors should have had the opportunity to decide for themselves whether Chanel's plan to use litigation to destroy the secondhand-market threat led Bleys to "slant, unconsciously or otherwise, [her] testimony." *Abel*, 469 U.S. at 52.

*Joseph Bravo.* Chanel (at 47-48) does not even attempt to argue that Bravo's testimony was not misleading. Nor could it: at trial, Bravo declared

a genuine Chanel handbag and genuine Chanel hardware counterfeit until he was forced to recant and blamed his "memory." J.A.3512-13, 3749, 3753. The jurors might have viewed Bravo's post-hoc testimony identifying differences between Exhibits 200 and 1369 with more skepticism had they known of his likely bias against secondhand sellers like WGACA. *See supra* pp.16-17.

### B. The Exclusion Prejudiced WGACA.

The exclusion of this bias evidence was particularly damaging to WGACA's ability to defend itself against Chanel's claim that it willfully sold counterfeit handbags. WGACA Br. 49-51. For example, Bleys' claim that Chanel only sued uncooperative secondhand sellers implied that WGACA's response to the cease-and-desist letter made it a particularly bad-faith actor. But Chanel was hardly a fair arbiter of what constituted satisfactory "cooperation" from an emerging sector it sought to destroy.

Other evidence supporting the jury's willfulness verdict was paper-thin. Chanel's main evidence stemmed from WGACA's response to Chanel's 2015 cease-and-desist letter, which asserted that a single handbag on WGACA's website was counterfeit, but did not disclose the ground for that assertion (*i.e.*, the Corti theft). J.A.4924-25. Chanel (at 7-8) argues that WGACA's prompt reply, which included pictures of the handbag's serial number tag, *see*

J.A.4930, was "false" based on entries in WGACA's internal database. But a WGACA former employee freely admitted at trial that WGACA struggled with "database errors" due to its "manual process." J.A.3709. And Chanel did not indicate that WGACA's response was unsatisfactory; to the contrary, Chanel thanked WGACA for "clearing this matter up." J.A.3710. Armed with the excluded evidence demonstrating that Bleys' account of this interaction was biased, the jury might have found that WGACA was a "scrappy team" rather than one willfully selling counterfeit goods. J.A.3712. Notably, after trial, the court stated that despite the jury's exorbitant damages award, "this was not a case of flagrant violations." SP.A.16.

Chanel (at 42-43) incorrectly claims that its witnesses' testimony was "not material to the jury's determination regarding whether WGACA sold counterfeit goods and infringed Chanel's trademark rights." *See also* Chanel Br. 45-46. But, when it comes to bias evidence, the question is whether such evidence is "sufficiently probative of [the witnesses'] bias to warrant its admission into evidence." *Carroll v. Trump*, 124 F.4th 140, 173 (2d Cir. 2024), *petition for cert. filed*, No. 25-573 (Nov. 10, 2025) (quoting *Abel*, 469 U.S. at 49). Evidence that Chanel's top brass worried the secondhand market could "become[] huge and a real threat," J.A.976, explains why its long-time

employees would slant their testimony to favor Chanel's narrative. As just discussed, their testimony bore on critical aspects of the jury's determinations.

Chanel (at 48-49) further contends that exclusion of this evidence did not prejudice WGACA because it was able to "aggressively cross-examine Chanel's witnesses as to their purported biases." But bias comes in many forms. True, as Chanel (at 37, 48-50) claims, WGACA's counsel did their best to elicit testimony from Chanel's witnesses regarding their general loyalty to Chanel and to demonstrate contradictions in their testimony. That evidence is categorically different from the precluded evidence, which would have undermined specific claims by Green and Bleys, *supra* pp.20-22, and would have demonstrated *how* those witnesses' loyalty to Chanel, and their understanding of Chanel's business objectives, slanted their testimony.

Finally, Chanel (at 50) argues that any error was harmless because WGACA's counsel referenced "Chanel's purported animus against the secondary market at closing." But by closing, the court had barred WGACA from introducing any *evidence* supporting the argument. WGACA's attempt to salvage its defense by making what Chanel (at 50) calls "unsupported" arguments did not cure the prejudice.

## III. THE STATUTORY DAMAGES AWARD VIOLATES THE DUE PROCESS CLAUSE.

This is the extraordinary case where the Due Process Clause demands vacatur of a statutory damages award. WGACA sold tens of thousands of Chanel handbags. J.A.5627-6471; *see* J.A.3579; WGACA Br. 9.[2] Chanel identified only *fourteen* handbags it claimed to be counterfeit, based almost entirely on ORLI, the secret database to which only Chanel has access. For these fourteen handbags, the jury awarded $4 million. The Due Process Clause exists precisely to prevent such grossly disproportionate penalties.

### A. The Seventh Amendment Does Not Insulate the Damages Award from Appellate Scrutiny.

Chanel (at 54-55) argues that the Seventh Amendment prevents this Court from reviewing the statutory damages award, and repeatedly hints at the need to defer to jury verdicts (at 52-53, 55, 65-66). But courts have long reviewed statutory damages awards for constitutional excessiveness. *E.g.*, *St. Louis, Iron Mountain & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919). And as one of Chanel's own cases confirms, this is a legal question reviewed de novo. *Sony BMG Music Enter. v. Tenenbaum*, 719 F.3d 67, 70 (1st Cir. 2013)

---

[2] Chanel (at 14) argues that only Phase I evidence is relevant, but WGACA's opening brief relied on Phase II evidence solely for background. All evidence relevant to WGACA's arguments on appeal was admitted at Phase I.

(cited at Chanel Br. 59-60). Moreover, it is well-settled that, even outside the constitutional context, district courts may set aside excessive verdicts consistent with the Seventh Amendment using the remittitur device. *See Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 167 (2d Cir. 2014). This Court has suggested that courts may reduce constitutionally excessive verdicts without resorting to remittitur but has not resolved the question. *See id.* at 168. Chanel has not raised this issue on appeal, which could be addressed on remand.

### B. The Award Violates the *Williams* Standard.

The $4 million award violates due process because it is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *Williams*, 251 U.S. at 67.

1. Chanel leads with the familiar "purposes of statutory damages": deterrence and the "public interest" in combating counterfeiting. Chanel Br. 56-59 (citing *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 127 (2d Cir. 2014)). But policy cannot override the Constitution. To be sure, as Chanel (at 55) observes, the Supreme Court noted in *Williams* that Congress may calibrate the statutory range to account for "punishment." 251 U.S. at 66. The Court, however, immediately tempered this point with the constitutional constraint outlined above. *Id.* at 66-67.

The Ninth Circuit's decision in *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022), reinforces this point. There, the court cautioned that a large award could "greatly exceed any reasonable deterrence value," even "where the per-violation penalty is constitutional." *Id.* at 1122-23. In other words, policy goals cannot justify an award alone if the award bears no rational relationship to defendants' actual conduct.

Congress contemplated maximum statutory damages for the "sophisticated, large-scale counterfeiter [who] has hidden or destroyed information." S. Rep. No. 104-177, at 10 (1995). WGACA is no such entity. For more than thirty years, WGACA has been a market-leading reseller of pre-owned luxury goods whose business model and reputation are built on authenticity. SP.A.16. Punishing and deterring WGACA with punitive statutory damages as if it were a counterfeiting operation does not serve the public interest.

2. Chanel (at 56-59) argues that a plaintiff's actual damages are irrelevant to the *Williams* analysis. Not so. *Williams* asks whether a penalty is "disproportioned to the offense," 251 U.S. at 67, which necessarily requires something to measure against. One measure of the offense is actual damages. Accordingly, the "ratio between statutory and actual damages matters" in due process analysis. *Gessele v. Jack in the Box Inc.*, 160 F.4th 1011, 1030 (9th Cir.

2025). Other courts have gone so far as to advise that statutory damages "should be woven out of the same bolt of cloth as actual damages." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 315 F. Supp. 2d 511, 520 & n.8 (S.D.N.Y. 2004) (citation omitted), *abrogated on other grounds by Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83 (2d Cir. 2012).

To be sure, actual damages might not always approximate the plaintiff's injury. *Gessele*, 160 F.4th at 1031. But, as the Ninth Circuit put it, "when a district court knows the actual damages, and that amount measures the injury well, it cannot blind itself to the ratio between that amount and the award." *Id.* Here, the district court found no "tangible economic harm." SP.A.27. Chanel did not seek statutory damages because its injury was *difficult* to quantify. Chanel sought statutory damages because it had *no* injury to quantify. Chanel's non-injury supports the conclusion that the award was wholly disproportioned.

Chanel seizes on the Eleventh Circuit's statement that "[t]he lodestar for the legality of an award for statutory damages is the range enshrined by Congress—not the amount of actual damages." *Top Tobacco, L.P. v. Star Imps. & Wholesalers, Inc.*, 135 F.4th 1344, 1350 (11th Cir. 2025). But that sentence addressed whether the statutory damages award violated the

Lanham Act because it exceeded actual damages. *See id.*[3] The Eleventh Circuit *separately* analyzed the due process question, *id.* at 1352-53, and found no due process problem only after emphasizing that the statutory damages were "not so disproportionate" to actual damages "as to offend the Constitution" and that "the verdict fell closer to the middle than the top" of the statutory range. *Id.* at 1352-53.[4] That the Eleventh Circuit analyzed the award's proportionality with actual damages at length confirms that proportionality matters.

What is more, *Top Tobacco* is distinguishable on its facts. There, the award was 61.5% of the statutory maximum and the defendant conceded potential actual damages of $200,000. *Id.* at 1353. Here, the award is 100% of the maximum and the district court found no "tangible economic harm to Chanel." SP.A.27.

---

[3] The other Lanham Act cases Chanel cites (at 57) are inapposite for the same reason. They address the statutory question whether a court may award statutory damages absent proof of actual harm, not the constitutional question.

[4] Chanel (at 58) also cites *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 908 (8th Cir. 2012), but that court considered the fact that the awarded statutory damages under the Copyright Act fell "toward the lower end of [the] broad [statutory] range."

3. Chanel argues that the statutory damages award is proportional to WGACA's offense. It is not.

Chanel's attempts (at 53 n.7, 63) to villainize WGACA to justify the award on noncompensatory grounds are unpersuasive. Chanel identifies no conduct by WGACA that would warrant a $4 million award on a deterrence or punishment rationale. Chanel attacks WGACA's recordkeeping. But negligent recordkeeping (which also plagued Chanel, *see supra* n.1) is a far cry from the egregious conduct that justified similar statutory damages awards in the cases that WGACA cited. WGACA maintained detailed sales records, J.A.3715, 5568-5623; 5627-6775, and a sophisticated authentication process, *e.g.*, J.A.3866-74. Although Chanel (at 63-64) blithely asserts that it would be difficult to ascertain WGACA's profits, it cites no supporting evidence. The parties had no difficulty quantifying WGACA's profits on other handbags, WGACA Br. 18, and at the Phase II trial WGACA's expert calculated its profits on the allegedly counterfeit handbags as $1,088. ECF 480-1 (Exhibit A) at 12-13.

Chanel (at 53 n.7) claims that WGACA "failed to cooperate with Chanel." But when Chanel sent its 2015 cease-and-desist letter, WGACA offered to partner on authentication. J.A.4929. *Chanel refused.* Chanel's letter

concerned only one bag, and it did not disclose the Corti theft or all the secretly voided serial numbers. And, as discussed above, Chanel responded to WGACA by thanking it for "clearing this matter up." J.A.3710. Chanel's claim (at 64) that WGACA was "cavalier" about counterfeits cannot be squared with the undisputed fact that Chanel identified only fourteen bags it claims to be counterfeit out of the tens of thousands of Chanel bags that WGACA sold.

Comparison to analogous cases confirms that this award is an extreme outlier. WGACA Br. 54-56. Chanel (at 65) dismisses many of WGACA's comparative cases as involving default judgments. But those cases involved the same willfulness standard and courts still exercised restraint. And while Chanel (at 65) claims that *Nike, Inc. v. Top Brand Co.*, 2006 WL 2946472 (S.D.N.Y. Feb. 27, 2006), involved the statutory maximum, as does this case, it completely ignores that the $4 million award in that case covered 1.2 million counterfeit items. Here, $4 million covered fourteen bags. The per-item disparity is approximately 85,000:1.

Finally, Chanel (at 62-63) cites the jury's note asking about the statutory maximum as evidence the award was "deliberate." But procedural deliberateness is irrelevant to substantive constitutionality.

### C. The Award Violates the *Gore* Standard.

Alternatively, the statutory damages award triggers the due process analysis set forth in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). Chanel (at 59-61) responds that *Gore*'s punitive damages guideposts are categorically inapplicable to statutory damages, citing precedents from the First and Eighth Circuits. Neither case is binding, and both misread *Gore*. The First Circuit reasoned that statutory notice satisfies *Gore*'s fair notice requirement. *Sony*, 719 F.3d at 70. But *Gore* requires more than notice of maximum penalties in the abstract. *Gore* requires that the penalty not be grossly out of proportion to the offense's severity. *See* 517 U.S. at 574-75, 580.

The Eighth Circuit repeated that same error. *See Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 907 (8th Cir. 2012). The court further reasoned that *Gore*'s third guidepost—comparison to authorized civil penalties—does not work in the case of statutory damages because "statutory damages *are* the civil penalties." *Id.* at 908. *Gore*'s third guidepost, however, asks not merely whether a penalty is authorized by statute, but whether the specific award is proportionate to penalties actually imposed in comparable cases. *See Gore*, 517 U.S. at 583-85. WGACA could not reasonably have predicted $4 million in liability for selling fourteen bags.

Chanel (at 61-62) attempts to explain away this Circuit's decision in *Parker* suggesting that statutory damages may trigger *Gore* on the ground that *Parker* involved a class action. *Parker v. Time Warner Ent. Co.*, 331 F.3d 13, 22 (2d Cir. 2003). But *Parker*'s reasoning is not limited to the class-action context, as other courts have recognized. *See generally In re Napster, Inc. Copyright Litig.*, 2005 WL 1287611, at *10 (N.D. Cal. June 1, 2005).

Chanel does not address the *Gore* guideposts on the merits and thus has forfeited any such argument. That failure speaks volumes; the $4 million award cannot survive *Gore* review. WGACA Br. 58-59. If the Court agrees that *Gore* is applicable, it should vacate the statutory damages award and remand.

## IV. THE DISTRICT COURT ERRED IN AWARDING UNRECOVERABLE "COSTS."

After insisting that WGACA post a supersedeas bond to cover the erroneous costs award, Chanel now (at 68) concedes that this Court should vacate the erroneous costs award. Chanel (at 66) suggests it will obtain all or some of its expenses on remand as true "costs." But it offers no argument that it can recover legal research expenses as "costs." *See* WGACA Br. 64. And, while Chanel (at 67) cites one Kansas district court case for the proposition that ESI-hosting costs are recoverable, the weight of authority is to the

contrary. *See* WGACA Br. 65-67. This will be an issue for the district court on remand.

## CONCLUSION

The Court should remand for a new trial on the counterfeiting claim or, alternatively, vacate the statutory damages award. Additionally, all agree the Court should vacate the "costs" award.

Respectfully submitted,

/S/ *Amy Mason Saharia*
LISA S. BLATT
AMY MASON SAHARIA
ALEXANDER HELDMAN
DANA GOTFRYD
CLAIRE GRODEN
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, SW*
*Washington, DC 20024*
*(202) 434-5000*
*asaharia@wc.com*

PETER T. SHAPIRO
LEWIS BRISBOIS BISGAARD & SMITH LLP
*7 World Trade Center*
*250 Greenwich Street, 11th Fl.*
*New York, New York 10007*
*(212) 232-1300*

FEBRUARY 25, 2026

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Amy Mason Saharia, counsel for appellants and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4), that the attached Reply Brief of Appellants is proportionately spaced, has a typeface of 14 points or more, and contains 6,995 words.

FEBRUARY 25, 2026

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

## CERTIFICATE OF SERVICE

I, Amy Mason Saharia, counsel for appellants and a member of the Bar of this Court, certify that, on February 25, 2026, a copy of the attached Reply Brief of Appellants was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

FEBRUARY 25, 2026

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA